PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GARY DAVID MORRISON, JR.,
        *Plaintiff-Appellee,*

v.

DAVID A. GARRAGHTY, Chief
Warden; M. C. MILLARD, Associate
Warden,
        *Defendants-Appellants,*

and

RONALD J. ANGELONE, Director,
Virginia Department of Corrections,
        *Defendant.*

UNITED STATES OF AMERICA,
        *Movant.*

No. 00-6540

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CA-97-681-3)

Argued: October 31, 2000

Decided: February 7, 2001

Before TRAXLER and KING, Circuit Judges, and
Alexander WILLIAMS, Jr., United States District Judge
for the District of Maryland, sitting by designation.

---

Affirmed by published opinion. Judge Traxler wrote the opinion, in
which Judge King and Judge Williams joined.

---

**COUNSEL**

**ARGUED:** Pamela Anne Sergeant, Assistant Attorney General, Criminal Law Division, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellants. Rebecca Kim Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia, for Appellee. **ON BRIEF:** Mark L. Earley, Attorney General, Criminal Law Division, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellants. Richard W. Ferris, Lydia L. King, Third-year Law Student, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia, for Appellee.

---

**OPINION**

TRAXLER, Circuit Judge:

Gary David Morrison, Jr., an inmate incarcerated at Greensville Correctional Center ("GCC") in Virginia, filed this action under 42 U.S.C.A. § 1983 (West Supp. 2000), claiming that defendants David A. Garraghty, warden of GCC, and M.C. Millard, assistant warden of GCC, violated his rights under the Equal Protection Clause of the United States Constitution by treating him differently from other inmates based solely upon a racial classification. Specifically, Morrison alleged that defendants refused to consider his request to obtain Native American religious items because he is not of Native American heritage. The district court enjoined defendants from refusing to consider Morrison's request for a religious exemption from the personal property restrictions normally applicable to all inmates solely on the basis of Morrison's race. We affirm.

I.

In order to maintain prison security and order, the Virginia Department of Corrections strictly limits the possession of personal property by prison inmates in accordance with Department Operating Procedure ("DOP") 856. However, prison administrators may grant exemptions, on a case-by-case basis, from the personal property restrictions

for religious personal property not specifically authorized by DOP 856. In order to evaluate a request for religious personal property, inmates are required to specify their claimed religion, the specific items needed, the purpose for which each item is used, why each item is necessary, and whether each item is mandated by their religion. A religious leader of the professed faith is contacted to verify the relevance of and need for the item, and prison officials take into account the sincerity of the inmate's professed beliefs and the security concerns of the prison in evaluating the specific request for an exemption.

Morrison is not a Native American Indian by birth, nor has he been adopted by a Native American tribe. He is, however, a member of a prisoner group known as HEART - "Heritage Examined Around Redman Traditions." HEART is not a religion. The majority of its members at GCC are not Native Americans and, consequently, do not practice any particular tribal-based religion. Nor do HEART members demand to participate in Native American religious ceremonies. Rather, Morrison, like other HEART members, claims to hold beliefs similar to those held by Native Americans practicing a tribal-based Native American religion. For example, Morrison, like many Native American inmates, professes belief in "the creator, mother earth, the sacredness of all living things, that everything has a spirit and is connected." J.A. 92, 100. In other words, Morrison claims not to practice any specific Native American tribal religion, but rather to practice what he terms "Native American Spirituality."

Because Morrison's professed religious beliefs are similar to Native American beliefs, Morrison also wishes to practice rituals similar to those practiced by Native American inmates. To do so, Morrison wishes to possess a number of Native American sacred items which he asserts are as equally necessary for him to practice his religion as they are for Native Americans to practice their own tribal-based religions. These items include sage, cedar, sweetgrass, kinnik-kinnik (sacred tobacco), other sacred herbs, shells, smoking pipes, feathers, beads, animal parts/hides (leather), and dream catchers.

The present controversy centers on a May 14, 1997, memorandum issued to all members of HEART, including Morrison, which reads as follows:

Effective immediately, *requests for acquiring or maintaining existing articles of Native American faith will only be considered for those inmates who are bona fide Native Americans.* Inmates requesting Native American faith items must be able to provide some type of supportive information to substantiate their heritage. Examples of verification may vary but should consist of one of at least the following:

- Inmate should be on the tribal roll of a Native American tribe (specify tribe)

- Inmate should have a blood relative who is a Native American (specify name and relation of blood relative to you and their tribe)

- Inmate should have a BIA card

* * *

*[O]nce you have authenticated your Native American heritage*, all requests for articles of faith must be accompanied by a description of specifically how the items are essential to your ability to practice your religion. All items will be considered on an individual basis based on tribal requirements, DOP/IOP 856, and institutional security concerns.

J.A. 179 (emphasis added). The GCC policy could hardly be more plain: a DOP 856 request "for acquiring or maintaining existing articles of Native American faith will only be considered for those inmates who are bona fide Native Americans." J.A. 179. Once an inmate satisfies the threshold requirement of authenticating his Native American heritage, the request will then be considered under the typical, and universally applied, criteria for evaluating a religious exemption request. Consequently, although Morrison and other non-Native American practitioners of Native American religious practices have been allowed to possess at least some Native American religious items in the past, requests for such items are now only considered if the requesting inmate can satisfy the threshold requirement of proving Native American heritage.

Because Morrison could not prove that he is a "bona fide" Native American, his most recent request for Native American religious items was refused. The lack of the appropriate racial lineage was the only reason given for the denial of Morrison's request for a religious exemption from the personal property restrictions; neither security concerns nor a lack of sincerity on the part of Morrison was ever given as a reason. Indeed, in response to his grievance, Morrison was specifically informed that his "preference does not substitute for valid lineage even if it is noted in your inmate record. I applaud your sincerity but I still need documentation of your heritage." J.A. 189. And, defendant Millard admitted that sincerity of religious belief was a factor to be weighed only after Native American heritage had been proven.

After implementation of the GCC policy, and defendants' denial of Morrison's request for a religious exemption for various Native American spiritual items under the policy, Morrison filed suit *pro se* against Ronald Angelone, the Director of the Virginia Department of Corrections, Warden Garraghty and Assistant Warden Millard pursuant to 42 U.S.C.A. § 1983, alleging that the GCC policy of limiting the possession of Native American religious articles to inmates of Native American descent violated the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Among other things, Morrison sought injunctive relief from further application of the race-based policy to him.

The district court granted summary judgment to defendants in part, dismissing all claims against Angelone and dismissing the First Amendment claim and the claim for monetary damages against Garraghty and Millard. An evidentiary hearing was then held before a magistrate judge on Morrison's remaining equal protection claim against Garraghty and Millard, after which the magistrate judge recommended that "Defendants be enjoined from prohibiting Morrison from obtaining herbs and other religious items based solely upon his lack of membership in the Native American race." J.A. 264. The district court agreed in large part with the magistrate judge's report and recommendation, ultimately concluding that Morrison had established an equal protection violation and entering a narrow injunction prohibiting defendants "from refusing Morrison a religious exemption from the existing property restrictions, available to other inmates, *solely* on

the basis of his lack of membership in the Native American race." J.A. 300. Taking care to point out that this was not tantamount to ordering defendants to allow Morrison to obtain the requested property, the district court emphasized that it was "simply enjoin[ing] the Defendants from using race as the only factor in their initial determination of whether Morrison is entitled to a religious exemption from the existing personal property restrictions." J.A. 300-01. Defendants Garraghty and Millard now appeal.

## II.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Clause "does not take from the States all power of classification," *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271 (1979), but "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). *See also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985) (holding that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike"). To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny. *See e.g.*, *City of Cleburne*, 473 U.S. at 439-40; *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir.), *cert. denied Mickle v. Moore*, 528 U.S. 874 (1999); *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818-19 (4th Cir. 1995).

Ordinarily, a state regulation or policy will be presumed to be valid and will be sustained if the classification is rationally related to a legitimate state interest. *See City of Cleburne*, 473 U.S. at 440. When the state classifies by race, alienage, or national origin, however, special concerns are implicated. *See id.* Such factors are "seldom relevant to the achievement of any legitimate state interest" and, therefore, "are deemed to reflect prejudice and antipathy — a view that those

in the burdened class are not as worthy or deserving as others." *Id.*; *see Hirabayashi v. United States*, 320 U.S. 81, 100 (1943) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."). Thus, outside of the prison environment, classifications which are based upon these factors, or which impinge upon fundamental rights protected by the Constitution, are subjected to stricter scrutiny, sustained only if they are narrowly tailored to serve a compelling state interest. *See City of Cleburne*, 473 U.S. at 440; *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (declining to make an exception for so-called "benign" racial classifications; "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny").

Morrison contends that we must also apply strict scrutiny review to defendants' race-based prison policy. However, it has long been recognized that, within the prison environment, courts grapple with yet another set of special considerations — those dictated by the needs and problems inherent in a penitentiary. The Equal Protection Clause indisputably protects prisoners from arbitrary racial discrimination, *see Turner v. Safley*, 482 U.S. 78, 84 (1987) (holding that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution"), but our review of prison policies and actions is tempered by the recognition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system," *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal quotation marks omitted) (alteration in original). Because "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," *Turner*, 482 U.S. at 84 (internal quotation marks omitted), the Supreme Court has held a "prison regulation [that] impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests" and not an exaggerated response to a particular concern, *id.* at 89. This lesser standard of scrutiny, the Court held, is necessary to ensure that prison administrators and not courts make difficult decisions concerning institutional operations:

> Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper

> their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby unnecessarily perpetuat[-ing] the involvement of the federal courts in affairs of prison administration.

*Id.* at 89 (internal quotation marks omitted). This more deferential standard applies even when the alleged infringed constitutional right would otherwise warrant higher scrutiny, *cf. Washington v. Harper*, 494 U.S. 210, 223 (1990); *O'Lone*, 482 U.S. at 349, such as when an inmate claims that his constitutional right to equal protection of the laws has been violated by the prison's implementation of a racial classification.

Accordingly, while a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoner claims under the equal protection clause, including those based upon a racial classification, must still be analyzed in light of the special security and management concerns in the prison system. *See e.g.*, *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977) ("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence."); *In re Long Term*, 174 F.3d at 471 (same); *see also Cruz v. Beto*, 405 U.S. 319, 321 (1972) ("[R]acial segregation, which is unconstitutional outside prisons, is unconstitutional within prisons, save for the necessities of prison security and discipline." (internal quotation marks omitted)); *Lee v. Washington*, 390 U.S. 333, 334 (1968) (Black, J., concurring) ("[P]rison authorities have the right, acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails."). An inmate's constitutional right to be protected from racial discrimination may be subject to restrictions that are reasonably related to a legitimate

penological interest. *See In re Long Term*, 174 F.3d at 468 ("Even assuming that analogous action outside the prison context would violate the Constitution, 'when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'") (quoting *Turner*, 482 U.S. at 89).

In determining whether a prison policy passes constitutional muster, we consider four factors: (1) whether there is a valid, rational connection between the policy and the penological interest; (2) whether an alternative means of exercising the right remains open to prison inmates; (3) the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence of ready alternatives that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. *See Turner*, 482 U.S. at 89-90. A policy will not be sustained "where the logical connection between the [policy] and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* Nor do we abandon our regard for the inherent concerns which surround a race-based classification. The perniciousness of a race-based classification is not lessened simply because we afford more leeway to prison officials in the operation of their facilities, and legitimate penological interests which will be served by race-based classifications will surely be few.

### III.

At the outset, we address defendants' assertion that because the district court granted summary judgment to them on Morrison's Free Exercise claim brought under the First Amendment, they should necessarily prevail on Morrison's Equal Protection claim brought under the Fourteenth Amendment. We disagree.

The Free Exercise Clause of the First Amendment forbids the adoption of laws designed to suppress religious beliefs or practices. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993). Its protections, including its directive that no law shall prohibit the free exercise of religion, extends to the prison environment. *See O'Lone*, 482 U.S. at 348; *Hines v. South Carolina Dep't of Corrections*, 148 F.3d 353, 357 (4th Cir. 1998); *Ali v. Dixon*,

912 F.2d 86, 88-89 (4th Cir. 1990). At the summary judgment stage, the district court found that Morrison had sufficiently alleged that "Native American Spirituality" was a religion protected by the First Amendment and that he had come forward with sufficient evidence to preclude summary judgment on the issue of whether his beliefs were sincerely held. However, the district court dismissed Morrison's free exercise claim because Morrison failed to identify a particular rite or practice which was foreclosed, or substantially burdened by, defendants' denial of his request for Native American religious items. Morrison has not appealed this adverse ruling.

Morrison's equal protection claim, in contrast, centers not on whether Morrison's religious exercise rights were violated by defendants' denial of his request. Rather, Morrison's equal protection claim rests upon defendants' decision to condition the mere consideration of his request for Native American religious items upon proof that he is of Native American race, without regard to whether he is sincere in his religious beliefs or whether the requested items pose a security risk for the prison. In other words, Morrison pursues not a constitutional right to obtain the religious items, but a constitutional right to be treated the same as Native American inmates requesting the same religious articles. The district court's injunction recognizes this distinction and narrowly tailors the injunction to the race-based conduct. Defendants are not required to allow Morrison to obtain the religious articles he has requested or which he may request in the future. Rather, the district court only enjoined the defendants from using race as the sole factor in their determination of whether Morrison would be granted an exemption from the personal property restrictions.

Also, Morrison need not prove that he would ultimately receive the items in order to obtain an injunction from further application of the race-based aspect of the policy to him. *See Texas v. Lesage*, 120 S. Ct. 467, 468 (1999). "[A] plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered." *Id.* Rather, the relevant inquiry is whether there has been an "'inability to compete on an equal footing.'" *Id.* (quoting *Northeastern Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993)); *see also Price v. City of Charlotte*, 93 F.3d 1241, 1247-48 (4th Cir. 1996). Thus, while Morri-

son can no longer pursue the claim that he is entitled to possess the requested religious items under the free exercise clause of the First Amendment, his equal protection claim, seeking to have his request for religious items considered under the same criteria applied to the requests of Native American inmates, survives.

IV.

We now turn to the question of whether the GCC policy, which conditions consideration of Morrison's receipt of Native American spiritual articles upon proof that he is of Native American race, violates Morrison's right to equal protection of the laws under the United States Constitution. We conclude that it does.

A.

Our first inquiry is whether Morrison is being treated differently from others similarly situated to him; *i.e.*, whether he is being intentionally or purposefully discriminated against on the basis of his race or national origin. If so, we must then determine whether the disparity in treatment based upon Morrison's race is justified by legitimate penological interests. *See e.g.*, *City of Cleburne*, 473 U.S. at 439-40; *In re Long Term*, 174 F.3d at 471.

1.

We agree with the district court's conclusion that Morrison has demonstrated that, under the GCC policy, he is treated differently from others with whom he is similarly situated and that this unequal treatment is the result of intentional or purposeful discrimination on the basis of his race. The language of the May 14, 1997 policy adopted by the GCC administrators draws a rather explicit racial distinction. GCC inmates seeking an exemption from the personal property restrictions to possess Native American spiritual items must be "bona fide Native Americans," able to document their "heritage." J.A. 179. The requirement is a necessary predicate to further consideration of the request for an exemption; no requests will be considered until the inmate "ha[s] authenticated [his] Native American heritage." J.A. 179.

And, it seems the policy was just so applied in Morrison's case. Morrison was not refused a religious exemption because he failed to meet the requirements applicable to all inmates requesting a religious exemption to the personal property restrictions. Rather, Morrison was denied an exemption, and was told that he was being denied an exemption, because he did not prove Native American heritage. The district court's findings in this regard enjoy overwhelming support in the record. *See Pullman-Standard v. Swint*, 456 U.S. 273, 287-88 (1982) (holding that "intent to discriminate on account of race . . . is a pure question of fact, subject to Rule 52(a)'s clearly-erroneous standard"). Defendant Millard told Morrison that he could not obtain the spiritual items due to his failure to prove his Native American heritage. Indeed, in response to Morrison's grievance following the denial of his request, Morrison was advised that:

> Documentation of your Indian heritage was requested via memorandum in May but you have not submitted any info to me as of today's date. Your preference does not substitute for valid lineage even if it is noted in your inmate record. I applaud your sincerity but I still need documentation of your heritage.

J.A. 189.

Assuming that Morrison is a sincere practitioner of a Native American Spirituality religion, which in turn calls for similar religious personal property as tribal-based Native American religions, Morrison is similarly situated to Native American inmates who also request an exemption from the personal property restrictions for non-conforming Native American religious items. Because Morrison is not of Native American heritage, however, the GCC policy prohibits equal consideration of his request for a religious exemption. Morrison was denied the right to have his request considered on an equal footing with that of his Native American counterparts, and this differential treatment is the product of intentional and purposeful discrimination based on race.

## 2.

Defendants assert, in a rather circular fashion, that Morrison was not discriminated against on the basis of his race because DOP 856

is a neutral, legitimate policy designed to serve safety and security concerns and that Morrison's request was denied not because he is a non-Native American but because he failed to prove that he sincerely practices a Native American religion.

We have little doubt that DOP 856, which limits the possession of personal property by prison inmates, is designed to serve legitimate safety and security concerns of the Virginia prison system. But, defendants' argument obviously misses the point. Morrison does not dispute that DOP 856 applies to all inmates equally or that it serves such worthy goals; neither DOP 856, nor the typical procedure employed by prison administrators for evaluating inmate requests for religious items, is challenged in this appeal. Morrison challenges only the GCC prison administrators' policy of conditioning consideration of a request for permission to possess Native American spiritual items upon the inmate's proof of Native American heritage. It is this facially discriminatory policy adopted by the GCC administrators and its application to Morrison's request for Native American religious items in this case, not DOP 856 itself, that is the subject of Morrison's challenge under the Equal Protection Clause.

We are equally unpersuaded by defendants' claim that proof of heritage was merely a "useful tool" to assist the prison administrators to determine, as part of the DOP 856 exemption inquiry, the sincerity of Morrison's religious beliefs. Morrison's request was not denied because he lacked a sincere belief in the tenets of Native American theology, but because he was of the wrong, racial "lineage." J.A. 189. Indeed, the sincerity of Morrison's beliefs in the tenets of Native American spirituality was at least ignored or presumed, if not truly "applaud[ed]" as indicated in the response to Morrison's grievance. J.A. 189. In truth, defendants never evaluated the sincerity of Morrison's beliefs because he failed to satisfy the threshold, racial requirement imposed by the defendants upon such a consideration.

Nor are we persuaded by the similar claim that Morrison's request was not denied because he was of the wrong race, but rather because he failed to satisfy the requirement, imposed upon all, that the inmate specify his claimed religion, what items he needed, and why the items were needed. This assertion rests upon the position that there is no "Native American" religion *per se*, or Native American beliefs or ritu-

als beyond those controlled by individual Native American tribes. Because only persons of Native American heritage, race, or tribal membership can embrace a Native American theology, so the argument goes, proof of one's tribal membership or possession of a BIA card is merely the means by which to specify or prove one's religion and the sincerity of one's belief in that religion.

Like the district court, we cannot endorse the proposition that an inmate's sincerity of religious beliefs in Native American spirituality can be defined solely by his race or heritage. In determining whether a particular professed faith is a religion, for First Amendment purposes, courts are to consider whether the faith "occupies a place in the lives of its members 'parallel to that filled by the orthodox belief in God' in religions more widely accepted in the United States." *Dettmer v. Landon*, 799 F.2d 929, 931 (4th Cir. 1986) (quoting *United States v. Seeger*, 380 U.S. 163, 166 (1964)). "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981) (holding that state could not deny unemployment compensation benefits to a Jehovah's Witness who terminated his employment because he believed his work in the production of a weapons-related product violated the principles of his religion); *Dettmer*, 799 F.2d at 932 (holding that prison officials could not deny religious articles to Wiccans based on the officials' conception of what constitutes a religion). Nor must religious observances be uniform to merit First Amendment protection. *See Dettmer*, 799 F.2d at 932. Differing beliefs and practices are not uncommon among followers of a particular creed, *see Thomas*, 450 U.S. at 715, and "it is not within the judicial function and judicial competence to inquire whether the petitioner or [another practitioner] more correctly perceive[s] the commands of their common faith," *id.* at 716. In sum, "[c]ourts are not arbiters of scriptural interpretation." *Id.*; *see also Dettmer*, 799 F.2d at 932.

The district court correctly recognized that defendants had "failed to present any convincing evidence for the broad proposition that race is a prerequisite for a sincere belief in Native American theology." J.A. 290. Native Americans themselves practice a diverse set of beliefs and practices depending upon their individual beliefs and tribal affiliations, but there has been no claim that the tribal-based

religions practiced by "bona fide" Native Americans are not recognized religions. While Morrison admittedly does not practice a specific tribe-based Native American religion and does not seek membership into any particular Native American tribe, he does profess to practice a Native American spirituality that combines religious elements from a variety of tribal practices. His beliefs, and religious practices, have no race-based requirement.

In sum, we agree with the district court's conclusion that prison officials cannot measure the sincerity of Morrison's religious belief in Native American Spirituality solely by his racial make-up or the lack of his tribal membership. *See Combs v. Corrections Corp. of America*, 977 F. Supp. 799, 802 (W.D. La. 1997) (enjoining prison officials from restricting the practice of the Native American Religion to those prisoners of Native American ancestry as violative of the First Amendment: "[t]he policy is akin to a requirement that practicing Catholics prove an Italian ancestry, or that Muslims trace their roots to Mohammed"). To the extent Morrison was deprived of the right to obtain Native American religious items because he failed to explain his religion, Morrison's failure was caused by a policy which equates sincere belief in traditionally Native American religious beliefs with Native American blood. And, despite defendants' attempts to characterize the denial of Morrison's request as one grounded upon a lack of sincere belief in Native American tenets, the district court correctly recognized that defendants did not deny his request on this basis. Consequently, we are not presented with the issue of whether Morrison is a sincere practitioner of a Native American faith. Assuming, as we must for present purposes, that Morrison is sincere in his beliefs, he has been purposefully and intentionally treated differently from Native American inmates who sincerely possess beliefs virtually identical to those held by Morrison.

## B.

Having determined that Morrison was subjected to intentional discrimination, we turn to the issue of whether the disparity in treatment based upon Morrison's race was justified by a legitimate penological interest. We conclude that it was not.

Defendants' primary contention is that the district court erred in enjoining them from implementing the policy because the items

requested by Morrison and the other HEART members are *per se* dangerous in the prison environment and, therefore, that the prohibition of these items is rationally related to the legitimate penological interests of prison safety and security. The district court found that the items requested were indeed dangerous in nature. By way of example, sacred herbs have a pungent odor which can mask the smell of burning marijuana; marijuana can be hidden within the sacred herbs making it difficult to detect; security keys can be hidden in medicine pouches; abalone shells, animal claws, and deer hooves can be broken or sharpened and used as a weapon or to facilitate an escape; leather and furry backpacks can harbor vermin and be a health hazard; deer hide can be put over razor wire to facilitate an escape; dream catchers, medicine bags, and furry backpacks can be used to hide contraband and weapons; and feathers can be used to jam locking devices on doors, burned to mask other odors, and fashioned into blow darts. Defendants successfully pointed to some such instances of inmate abuse of religious items and argued that the potential dangers were compounded by the HEART members' refusal to allow security searches of their items; by the limited time, space and staffing available to deal with non-Native American requests to practice rituals with these items; and by the fact that the items are susceptible to being stolen by other inmates who can misuse them. Defendants also asserted a concern that some inmates have pretended to be Native American as a guise to strong-arm and rob inmates and that Native American inmates have been offended by the pretension of Native American status, engendering resentment and the potential for conflict and disruption.

Without question, prison safety and security is a legitimate, indeed compelling, penological interest. *Cf. In re Long Term*, 174 F.3d at 469; *Hines*, 148 F.3d at 358. Such matters of security are precisely the type of day-to-day considerations that require prison authorities to take actions which call for the lesser standard of scrutiny applicable to regulations and policies implemented in the prison environment. *See Turner*, 482 U.S. at 89-90. And, defendants have made a striking case for prohibiting inmate use of the requested Native American religious items due to safety and security concerns. Defendants have failed, however, to demonstrate that the race-based GCC policy is reasonably related to this legitimate penological interest. *See Turner*, 482 U.S. at 89-90 ("[A] regulation cannot be sustained where the logical

connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.").

As an initial premise, we note that while defendants perhaps could have prohibited inmate possession of the requested items because they threaten prison safety and security, they have chosen not to do so. Instead, defendants have adopted a policy which allows consideration of requests for religious exemptions from the personal property restrictions submitted by Native American inmates for such items, but which unequivocally denies non-Native Americans, such as Morrison, the same consideration solely on the basis of their lack of membership in the Native American race. Consequently, the issue before us is not whether all inmates, or any particular inmate, can be denied possession of these potentially dangerous items based upon safety and security concerns. Rather, the issue before us is whether defendants' race-based policy of denying possession of these items is rationally related to the goal of prison safety and security. Like the district court, we are satisfied that it is not.

First, as found by the district court, defendants have failed to demonstrate that the requested spiritual items are any less dangerous in the hands of a Native American inmate, as opposed to a non-Native American inmate who sincerely wishes to practice Native American spirituality. In fact, at least one Native American inmate, who was also a member of HEART, was allowed to possess these dangerous items in the past despite an extensive history of institutional infractions, whereas Morrison was denied the right to possess them despite the fact that he had not previously abused the privilege of doing so. Nor was there any evidence that one group, but not the other, has abused or misused such items in the past.

Second, defendants have failed to substantiate the claim that the policy promotes security because it appeases Native Americans who take offense to white inmates practicing their faith. As found by the district court, there was no evidence that any Native American inmates at GCC objected to the religious practices of HEART members and, on the contrary, the only Native American prisoner who testified stated that Native Americans at GCC encourage white inmates in their spiritual pursuits and are not offended by non-Native Americans who hold a sincere belief in Native American theology. At best,

the evidence demonstrated that only a few Native Americans at another institution were offended by white inmates practicing Native American rituals.*

Finally, we appreciate defendants' desire to accommodate the religious requests of Native American inmates who are sincerely practicing their respective tribal religions, despite the dangerous nature of the items requested. And, we recognize that in light of the limited time, space, and staffing available in the prison environment, the GCC policy would serve to limit the total number of dangerous articles and, thereby, render their presence in the prison environment a controllable factor. However, given defendants' failure to substantiate a claim that the sincerity of one's belief in Native American theology is determined by the color of his skin or the origin of his birth, and concomitant failure to articulate a rational connection between an inmate's race and his propensity to misuse the items requested, it is patently impermissible to control the number of dangerous items by instituting a policy which arbitrarily makes race or heritage the threshold requirement for according an individual inmate the privilege of obtaining them.

## V.

In conclusion, we hold that the district court has appropriately entered a narrow judgment, enjoining defendants "from refusing Morrison a religious exemption from existing property restrictions *solely* on the basis of his lack of membership in the Native American race." J.A. 283 (emphasis added); *see* 18 U.S.C.A. § 3626(a)(1)(A) (West 2000) ("Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."). Like

---

*We need not consider defendants' assertion that the district court failed to properly consider the district court ruling in *Hernandez v. Angelone*, No. 97-1329 (E.D. Va. Aug. 14, 1999), which it characterizes as contrary to the district court's decision in this case. The *Hernandez* decision, and other similar district court cases, *see e.g.*, *Mitchell v. Angelone*, 82 F.Supp.2d 485 (E.D. Va. 1999), are currently on appeal to this court. We think it prudent to leave the ultimate determinations in those cases to their respective appeals.

the district court, we reiterate that defendants are not required by our decision to allow Morrison or any other inmate to possess the requested Native American items. We likewise offer no opinion as to whether Morrison sincerely holds the beliefs he espouses; that is a factual matter left for resolution by the prison administrators in the first instance when exercising their discretion in evaluating such requests. *Cf. Thomas*, 450 U.S. at 716 (noting, in First Amendment context, we inquire as to whether there is an honest religious conviction at issue).

If the number of inmates possessing a sincere, religious belief in the Native American religious practices and requesting the items at issue becomes so great as to render their presence in the prison environment uncontrollable or infeasible from a security standpoint, a different case may be presented. For present purposes, it is sufficient to hold that defendants' policy of measuring the sincerity of an inmate's belief in a Native American theology by whether he is of Native American blood, and conditioning the receipt of a benefit on that racial basis, runs afoul of the Equal Protection Clause of the Fourteenth Amendment.

## VI.

For the foregoing reasons, the decision of the district court is therefore affirmed.

*AFFIRMED*