Filed: February 4, 2014

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-6355**
(7:11-cv-00191-JLK-RSB)

GARY WALL,

        Plaintiff - Appellant,

      v.

JAMES WADE, Food Services Manager, ROSP; ROBERT ROWLETTE, Assistant Warden of ROSP; T. RAY, Warden of ROSP; J. STALLARD, Counselor of ROSP,

        Defendants – Appellees,

      and

C. SELYERS, Food Services Supervisor, ROSP; CAPTAIN K. MCCOY, Employee of ROSP; SERGEANT C. GILBERT, Employee of ROSP; SERGEANT T. ADAMS, Investigator of ROSP; CORPORAL D. LEE, Employee of ROSP; CORPORAL D. FARMER, Employee of ROSP; CORPORAL PHILLIPS, Employee of ROSP; K. CROWDER-AUSTIN, Western Regional Grievance Ombudsman for VADOC; LIEUTENANT J. FANNIN, Employee of ROSP; LIEUTENANT S. DAY, Employee of ROSP; SERGEANT T. HALE, Employee of ROSP; SERGEANT UNKNOWN, Employee of ROSP; CORPORAL BARROWMAN, Employee of ROSP; CORPORAL GIBSON, Employee of ROSP; CORPORAL D. VANDOVER, Property Officer of ROSP; CORPORAL UNKOWN, Employee of ROSP; R. MULLINS, Grievance Coordinator of ROSP; JOHN GARMAN,

        Defendants.

## O R D E R

The Court amends its opinion filed February 3, 2014, as follows:

On page 3, section I., line 6 -- the word "sunrise" is added after the word "before."

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-6355

GARY WALL,

Plaintiff - Appellant,

v.

JAMES WADE, Food Services Manager, ROSP; ROBERT ROWLETTE, Assistant Warden of ROSP; T. RAY, Warden of ROSP; J. STALLARD, Counselor of ROSP,

Defendants – Appellees,

and

C. SELYERS, Food Services Supervisor, ROSP; CAPTAIN K. MCCOY, Employee of ROSP; SERGEANT C. GILBERT, Employee of ROSP; SERGEANT T. ADAMS, Investigator of ROSP; CORPORAL D. LEE, Employee of ROSP; CORPORAL D. FARMER, Employee of ROSP; CORPORAL PHILLIPS, Employee of ROSP; K. CROWDER-AUSTIN, Western Regional Grievance Ombudsman for VADOC; LIEUTENANT J. FANNIN, Employee of ROSP; LIEUTENANT S. DAY, Employee of ROSP; SERGEANT T. HALE, Employee of ROSP; SERGEANT UNKNOWN, Employee of ROSP; CORPORAL BARROWMAN, Employee of ROSP; CORPORAL GIBSON, Employee of ROSP; CORPORAL D. VANDOVER, Property Officer of ROSP; CORPORAL UNKOWN, Employee of ROSP; R. MULLINS, Grievance Coordinator of ROSP; JOHN GARMAN,

Defendants.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. Jackson L. Kiser, Senior District Judge. (7:11-cv-00191-JLK-RSB)

Argued: December 11, 2013          Decided: February 3, 2014

Before GREGORY, DAVIS, and WYNN, Circuit Judges.

Vacated and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge Davis and Judge Wynn joined.

**ARGUED**: Elizabeth Scott Turner, COLLEGE OF WILLIAM & MARY, Williamsburg Virginia, for Appellant. Earle Duncan Getchell, Jr., OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF**: Tillman J. Breckenridge, Washington, D.C., Robert M. Luck III, REED SMITH LLP, Richmond, Virginia; Patricia E. Roberts, WILLIAM & MARY LAW SCHOOL APPELLATE AND SUPREME COURT CLINIC, Williamsburg, Virginia, for Appellant. Kenneth T. Cuccinelli, II, Attorney General of Virginia, Michael H. Brady, Assistant Solicitor General, Patricia L. West, Chief Deputy Attorney General, Wesley G. Russell, Jr., Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

GREGORY, Circuit Judge:

In this appeal we review the application of a state prison's policy conditioning an inmate's request for a religious accommodation on his possession of physical indicia of faith. We also address whether the inmate's claims for equitable relief were mooted after the prison abandoned the policy. We vacate the district court's summary judgment order granting the defendants qualified immunity on the plaintiff's claims for monetary relief. We also vacate the district court's decision that the prison's abandonment of the policy mooted the claims for equitable relief. We remand to the district court for such further proceedings as may be appropriate.

**I.**

The plaintiff, Gary Wall, is a state prisoner housed at Red Onion State Prison ("ROSP") in Pound, Virginia. As a member of the Nation of Islam, in 2008 and 2009 Wall was allowed to observe the holy month of Ramadan while in state custody. To accommodate Ramadan observance, prison officials provide participating inmates with special meals served before sunrise and after sunset. While at ROSP, Wall also received "common fare" meals, which satisfied his religious beliefs.

Prior to 2010, Muslim inmates at ROSP simply had to sign up to participate in Ramadan. In 2009, approximately half of the

3

inmate population signed up. ROSP staff later determined that a significant number of the participating inmates were not, in fact, practicing Muslims. As a result, ROSP devised a new eligibility policy for 2010: in addition to signing up, inmates had to provide some physical indicia of Islamic faith, such as a Quran, Kufi, prayer rug, or written religious material obtained from the prison Chaplain's office.[1] ROSP inmates who did not have such materials or refused to acquire them were deemed insincere in their religious beliefs and were prohibited from participating in Ramadan.[2]

Wall was one of the inmates who was not allowed to participate. After initially signing up, Wall was asked by defendants James Wade, C. Selyers, and J. Stallard to provide physical evidence of the sincerity of his beliefs in accordance with the new policy. Wall stated that all his belongings, including his articles of faith, had been lost during his

---

[1] This policy was somewhat unique among Virginia Department of Corrections ("VDOC") facilities. Most prisons maintain a "religious pass list," which keeps track of which inmates participate in specific religious services. However, because most ROSP inmates are in long-term administrative segregation, ROSP does not offer group religious services. Consequently, ROSP does not keep a religious pass list.

[2] In 2010, with the new policy in place, only 176 of the 360 inmates who signed up to participate provided the necessary materials. The other 187 inmates were prohibited from observing the fasting hours.

4

transfer to ROSP. He showed Wade a state court judgment against the Commonwealth as proof that VDOC had lost his possessions.[3] Wall also produced documents showing that he was receiving common fare meals in accordance with his faith, and he informed the officers that he had observed Ramadan in 2008 and 2009. Despite this, Wade responded, "that don't mean anything," and instructed Stallard and Selyers to remove Wall from the Ramadan list. J.A. 139.

Wall then filed an informal complaint, again explaining that his religious materials had been lost and requesting to be allowed to participate. In a memo in response to the complaint, Wade reiterated ROSP's new policy, stating:

> [ROSP] does not have religious services so the following rules apply to this institution. You are required to have religious material such as ([ku]f [i], [Qu]r[a]n, prayer rug or religious pamphlets that pertain to the Ramadan month long fasting.) Food service went to every inmate[']s cell to inspect the above religious material. Either you had no religious material or refused to present material[.] [T]his is why you were removed from the Ramadan pass list.

J.A. 42.

On August 11, 2010, the first morning of Ramadan, Wall did not eat breakfast and concealed a portion of his meal in his

---

[3] Although the judgment itself does not reference the nature of Wall's underlying claim, he later received a letter from the Virginia Attorney General's office explaining that it was in response to "founded grievances regarding . . . lost property . . . ." J.A. 126.

cell to save until after sunset. ROSP staff found the food and threatened to charge him with possessing contraband. Faced with choosing between starvation and sanctions, Wall ate during the day and violated his religious beliefs.

On August 15, Wall filed a formal grievance, which was also denied. Six days later, he had a conversation with Wade and Assistant Warden Robert Rowlette, in which Rowlette asked if he would like to be put back on the Ramadan list provided it could be verified that he had truly lost his belongings. According to Wall, he responded that he still wanted to participate, but that he also wanted an explanation for why he was taken off the list in the first place. Rowlette replied, "[o]kay," and then walked away while Wall shouted "I want to participate in Ramadan! I want my Ramadan, Rowlette!" J.A. 140. According to the defendants, however, Wall refused Rowlette's offer to be put back on the list, saying, "[n]o, I'm going to pursue this in court." J.A. 93. Ultimately, Wall was not allowed to participate in Ramadan in 2010.

Having exhausted his administrative remedies, Wall filed suit under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq., and 42 U.S.C. § 1983. In an amended complaint, Wall alleged violations of RLUIPA and the Free Exercise Clause of the First Amendment, in addition to several related state law claims. The amended

6

complaint sought "[a] declaratory judgment, nominal damages, unspecified joint and several compensatory damages, $10,000 in punitive damages from each defendant, and any additional relief this court deems just, proper, and equitable." J.A. 32–33.

Shortly after the suit was filed, Wall was transferred out of ROSP to a lower-security facility. Subsequently, the district court granted the defendants' motion for summary judgment, finding that any claims for equitable relief were moot following Wall's transfer, and ruling that the defendants were entitled to qualified immunity on the plaintiff's claim for damages.

Following the district court's ruling, Wall was transferred back to ROSP. The defendants claim that ROSP has since abandoned its policy of requiring prisoners to possess physical indicia of faith in order to participate in Ramadan or other religious observations. The new policy, adopted in a September 13, 2011 memo by VDOC's Chief of Corrections Operations,[4] states that inmates in segregation facilities, such as ROSP, may demonstrate sincerity by showing that they have in the past borrowed religious material such as DVDs, CDs, or literature

_____

[4] The memo was not submitted as evidence in this case and is therefore not part of the record, but it was referenced in a related case involving the same policy. DePaola v. Wade, No. 7:11-cv-00198, 2012 U.S. Dist. LEXIS 44340, *7–10 (W.D. Va. Mar. 30, 2012).

7

from the Chaplain's office. The memo states that the change was made following an investigation by VDOC's Inspector General, which concluded that "it is not appropriate to require inmates to buy something which is related to exercising First Amendment [r]ights." Following the policy change, Wall and other inmates who were prohibited from observing Ramadan in 2010 were allowed to participate in a "make-up" Ramadan in April 2012.

## II.

We review two issues in this appeal: whether the district court correctly determined that Wall's equitable claims under RLUIPA and the First Amendment were moot following ROSP's decision to abandon the 2010 Ramadan policy; and whether the district court correctly granted the defendants qualified immunity on Wall's First Amendment claim for damages.[5] Both issues are questions of law which we review de novo. See Green v. City of Raleigh, 523 F.3d 293, 298 (4th Cir. 2008) (mootness); Johnson v. Caudill, 475 F.3d 645, 650 (4th Cir. 2007) (qualified immunity). We address the issues in turn.

---

[5] We note at the forefront that Congress did not authorize damages claims against state officials under RLUIPA. See Sossamon v. Texas, 131 S. Ct. 1651, 1658-59 (2011) (prohibiting damages claims against state officials in their official capacity); Rendleman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009) (same for individual capacity). Therefore, the plaintiff's only potential remedies under RLUIPA are equitable.

8

**A.**

In granting the defendants' motion for summary judgment, the district court found that Wall's transfer to another facility mooted his request for equitable relief.[6] Although Wall's subsequent return to ROSP rendered this justification obsolete, the district court also ruled that in such an event Wall's claims would remain moot in light of VDOC's decision to terminate the 2010 Ramadan policy.

It is well established that a defendant's "voluntary cessation of a challenged practice" moots an action only if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189 (2000); see Knox v. Service Employees Intern.

_____

[6] As an initial matter, the defendants argue that, to the extent Wall has a justiciable claim for equitable relief, his amended complaint failed to request injunctive relief in particular. While it is true that his original complaint was more specific than the amended complaint, we are comfortable reading Wall's prayer for any relief deemed "just, proper, and equitable" as encompassing a claim for injunctive relief. An appropriately liberal reading of the amended complaint indicates that Wall sought to prevent the defendants from wrongfully limiting his observance of Ramadan in the future through the issuance of an injunction. See De'lonta v. Johnson, 708 F.3d 520, 524 (4th Cir. 2013) ("[Courts must] afford liberal construction to the allegations in pro se complaints raising civil rights issues."). We also note that the district court, while not explicitly ruling on the issue, referred to Wall's claim as a request for "injunctive relief." J.A. 142.

9

Union, Local 1000, 132 S. Ct. 2277, 2287 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). Were it otherwise, "courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" City of Mesquite v. Aladdin's Castle, 455 U.S. 283, 289 n.10 (1982) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953)). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." Laidlaw, 528 U.S. at 189 (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968)).

We have no difficulty concluding that the defendants failed to meet their "heavy burden" of establishing that it is "absolutely clear" the 2010 Ramadan policy will not be reinstated. Id. Unsubstantiated assurances in their appellate brief aside, the defendants have failed to put forth even a single piece of evidence establishing that the practice of requiring physical indicia of faith has been terminated once and for all. The September 13, 2011 memorandum describing VDOC's purported change in policy -- which was only submitted in a

10

different case[7] -- also fails to establish that VDOC will not reinstate the policy following completion of this lawsuit. We have previously held that when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot. Town of Nags Head v. Toloczko, 728 F.3d 391, 395 n.3 (4th Cir. 2013); Pashby v. Delia, 709 F.3d 307, 316 (4th Cir. 2013); Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 800 (4th Cir. 2001). Nothing in the memo suggests that VDOC is actually barred -- or even considers itself barred -- from reinstating the 2010 Ramadan policy should it so choose. To the contrary, the fact that at least three separate policies have been utilized at ROSP since 2009 indicates some degree of doubt that the new policy will remain in place for long.

The defendants invite us to adopt an approach employed by several of our sister circuits, in which governmental defendants are held to a less demanding burden of proof than private defendants. See, e.g., Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1116 (10th Cir. 2010) ("In practice . . . , Laidlaw's heavy burden frequently has not prevented governmental officials from discontinuing challenged practices

_____

[7] While we are confident in our authority to take judicial notice of the memorandum, we note that litigants do themselves no favor in relying on our willingness to do so.

11

and mooting a case."); <u>Sossamon v. Texas</u>, 560 F.3d 316, 325 (5th Cir. 2009) ("[C]ourts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity."). However, even if we were to adopt this approach, a question which we expressly do not decide, we would have no trouble determining that the defendants' near total failure to provide the Court with information regarding the change would remain insufficient even under a lesser standard. In short, bald assertions of a defendant -- whether governmental or private -- that it will not resume a challenged policy fail to satisfy any burden of showing that a claim is moot.[8] We therefore vacate the district court's dismissal of the plaintiff's equitable claims.

---

[8] Nor do we find any merit in the defendants' contention that the voluntary cessation doctrine does not apply in this case because the change in policy was unrelated to the litigation. <u>See</u> <u>ACLU of Mass. v. U.S. Conf. of Catholic Bishops</u>, 705 F.3d 44, 55 (1st Cir. 2013) ("[T]he voluntary cessation doctrine does not apply when the voluntary cessation of the challenged activity occurs because of reasons unrelated to the litigation.") (quoting M. Redish, Moore's Federal Practice, § 101.99[2]). It is undisputed that the September 13, 2011 memo was issued after the plaintiff's original complaint was filed; and, as noted above, the change was made in the midst of a separate lawsuit filed by another ROSP inmate challenging the same policy. The timing strongly indicates that the change was at least somewhat related to the two pending lawsuits.

Turning to the plaintiff's claim for monetary damages under the First Amendment, the district court ruled that the defendants were entitled to qualified immunity.[9] Qualified immunity protects government officials performing discretionary functions unless: "(1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). Viewing the facts in the light most favorable to the plaintiff, we conclude that the defendants have failed to establish as a matter of law that the 2010 Ramadan policy, as applied to the plaintiff, did not violate his First Amendment rights. We also hold that their alleged actions violated the plaintiff's clearly established rights, and that they are therefore not entitled to qualified immunity.

---

[9] The plaintiff's claims for equitable relief are not affected by the doctrine of qualified immunity, which "has no application to suits for declaratory or injunctive relief." South Carolina State Bd. of Dentistry v. F.T.C., 455 F.3d 436, 446-47 (4th Cir. 2002) (quoting Rowley v. McMillan, 502 F.2d 1326, 1331 (4th Cir. 1974)).

13

## 1.

"The Free Exercise Clause of the First Amendment forbids the adoption of laws designed to suppress religious beliefs or practices." Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001). This encompasses policies that impose a substantial burden on a prisoner's right to practice his religion. Lovelace v. Lee, 472 F.3d 174, 198 & n.8 (4th Cir. 2006). "Under . . . the Free Exercise Clause . . . , a prisoner has a 'clearly established . . . right to a diet consistent with his . . . religious scruples,' including proper food during Ramadan." Id. at 198-99 (quoting Ford v. McGinnis, 352 F.3d 582, 597 (2nd Cir. 2003)). The defendants concede that denying Wall the opportunity to observe Ramadan imposed a substantial burden on his religious freedom.

However, free exercise restrictions that are "reasonably adapted to achieving a legitimate penological objective" are permissible. Id. at 200. In other words, then, prison officials may restrict an inmate's religious practices subject to a "reasonableness" test that accords substantial deference to the professional judgment of correctional officers. See Overton v. Bazzetta, 539 U.S. 126, 132 (2003).[10]

---

[10] This differs from the test utilized under RLUIPA, which requires that restrictions be narrowly tailored to a compelling government interest. See 42 U.S.C. § 2000cc-1(a). Thus, in the
(Continued)

A prison regulation is reasonable and thus permissible if it satisfies the four factors established in <u>Turner v. Safley</u>, 482 U.S. 78 (1987). That test asks: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action. <u>Lovelace</u>, 472 F.3d at 200 (citing <u>Turner</u>, 482 U.S. at 89-92).

As a preliminary matter, "prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic." <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 725 n. 13 (2005); see <u>Gillette v. United States</u>, 401 U.S. 437, 457 (1971) ("[T]he 'truth' of a belief is not open to question; rather, the

prison context, the First Amendment affords officials greater latitude than RLUIPA. <u>Lovelace</u>, 472 F.3d at 199 n. 8. ("RLUIPA adopts a 'more searching standard' of review than that used for parallel First Amendment claims, strict scrutiny instead of reasonableness.") (quoting <u>Madison v. Ritter</u>, 355 F.3d 310, 314-15 n.1 (4th Cir. 2003)).

question is whether the objector's beliefs are 'truly held.'") (internal quotation marks omitted). Accepting that prisons may limit religious accommodations to sincere believers, the question in this case is whether ROSP's specific means of testing Wall's sincerity was permissible; that is, whether ROSP was allowed to require him to possess specific, physical items of Islamic faith as proof of belief.

We hold that under the current record, the defendants' application of the 2010 Ramadan policy fails an analysis under the Turner factors.[11] First, demanding specific physical items as proof of faith will rarely be an acceptable means of achieving the prison's stated interest in reducing costs. Strict application of such a rule fails even a rational connection requirement. Although we recognize that prison officials must make determinations of who is entitled to accommodations, it exceeds their authority to decide which, if any, religious relics are sufficiently important as to

---

[11] With limited exceptions, much of the material facts regarding the defendants' actions are undisputed. However, for the plaintiff to ultimately succeed on remand, he must still prove that the defendants' actions were intentional. Lovelace, 472 F.3d at 194-95, 201-02 (holding that suits under both RLUIPA and the First Amendment require a showing of "conscious or intentional interference" with the plaintiff's rights). In evaluating the legality of the policy in this section of the opinion, we focus on the largely undisputed allegations of the defendants' actions, and not their as yet unproven intent.

16

constitute an appropriate gauge of faith. This Court has held, albeit under RLUIPA's more exacting standard, that prison administrators may not assume that a "lack of sincerity (or religiosity) with respect to one practice [of a given religion] means lack of sincerity with respect to others." Lovelace, 472 F.3d at 188. Thus, the fact that Wall did not have, for example, a prayer rug in his possession is not a sufficiently reliable indicator of whether he is a practicing Muslim. A prison may not condition an inmate's constitutionally protected rights on so narrow a set of grounds without "render[ing] the policy arbitrary or irrational." Turner, 482 U.S. at 89-90.

Indeed, the circumstances of Wall's case highlight exactly why such an unyielding policy is unreasonable. Despite Wall's other outward manifestations of faith, most notably his past participation in Ramadan and common fare diet,[12] he was prohibited from observing the fast solely because he did not possess any of the approved items. The defendants also ignored Wall's perfectly believable explanation, later verified, that he did not have the items only because VDOC had lost all of his

---

[12] The defendants note that members of a number of different faiths receive the common fare diet, making it an over-inclusive test. However, Wall's amended complaint states that he presented Selyers with his common fare signup form, which specifically notes his Islamic faith as the justification for participating in the diet.

17

belongings during his transfer to ROSP. Nor was Wall's attempt to store food in his cell on the first day of Ramadan enough to convince ROSP officials that he was sincere in his desire to observe the fasting requirements. Wall also continued to pursue the issue after his initial denial, filing several grievances and requesting to be placed back on the list. The defendants rejected these requests and simply reiterated their policy without further consideration of Wall's circumstances. Finally, at least according to Wall, on August 21, 2011, Rowlette offered to place Wall back on the participation list provided he could verify that Wall's belongings had actually been lost. Rowlette then rescinded the offer once Wall stated that he intended to pursue a formal adjudication of the matter regardless. Taking this fact in the light most favorable to Wall, it indicates that the officials were more interested in protecting their earlier decision than in honestly discerning whether Wall should be permitted to participate.

In short, Wall has alleged that the defendants ignored numerous signs that he is a practicing Muslim who was merely seeking to exercise his genuinely held beliefs. By applying the policy in so rigid a manner, the restriction lost whatever

18

"valid, rational connection" to the government's stated interest that might have existed at the time it was adopted.[13]

An analysis of the remaining Turner factors also supports the plaintiff's claims. The second factor asks whether "alternative means of exercising the right . . . remain open to [the] prison[er]." 482 U.S. at 90. It is clear that Wall was absolutely precluded from observing Ramadan because of the defendants' actions. When he attempted to adhere to the fasting requirements on his own by storing food in his cell, he was threatened with disciplinary action. The only alternative means proffered by the defendants is that had Wall obeyed the policy, he would have been allowed to participate. This suggestion, of course, it is not an "alternative means" at all, it is merely a

---

[13] We note our disagreement with the defendants' suggestion that the Supreme Court's decision in O'Lone v. Estate of Shabazz, 482 U.S. 342, 350 (1987), is controlling. In O'Lone, the Court examined a prison's policy of prohibiting inmates assigned to outside work duty from returning to the prison during the day in order to attend Jumu'ah, an Islamic congregational service held on Friday afternoons. Id. at 349. The Court deemed that the policy was logically related to the prison's legitimate interest in maintaining "institutional order and security" by relieving overcrowding, easing "congestion and delays at the main gate," and lessening the pressure on the guards who previously had to evaluate individual return requests. Id. at 350-51. While the O'Lone decision certainly supports the general proposition that courts should be deferential to the decisions of prison administrators, the case does not examine the relevant issue in this case -- the reasonableness of a sincerity test -- and is therefore largely inapposite.

19

reiteration of the same rigid requirements Wall was unable to meet.[14]

We also believe that the third Turner factor, which examines the impact the requested accommodation would have on the prison's efficient operation, also supports the plaintiff's claim. 482 U.S. at 92. We are not satisfied that the defendants have sufficiently explained how a less restrictive policy would have imposed a significant burden on prison resources. The defendants contend generally that Ramadan is expensive because participants require special meals, and the schedules of both inmates and guards must be rearranged to accommodate pre-dawn and post-sunset meals. However, the record is void of any specific information regarding these purported costs, and we are not content to permit a prison to deny an inmate's constitutional right in the face of such generalized

---

[14] We recognize that in O'Lone the Supreme Court interpreted the concept of alternative means broadly, asking not only whether a particular religious practice has been impeded, but instead addressing "all forms of religious exercise" of the prisoner's faith. 482 U.S. at 352. However, such an interpretation is unduly restrictive with respect to Wall's case. Ramadan, unlike Jumu'ah, is one of the five pillars of Islam, and its observance is integral to all practicing Muslims. Moreover, we have previously held that "a prisoner has a clearly established . . . right to a diet consistent with his . . . religious scruples, including proper food during Ramadan." Lovelace, 472 F.3d at 198-99 (internal quotation marks and citation omitted). We decline to read O'Lone, decided before Lovelace, as conflicting with the latter's holding.

concerns. This is especially so in light of the negligible costs associated with adding one additional inmate to an already existent program. Nor have the defendants presented a convincing argument why an individualized interpretation in Wall's case would have been unduly burdensome. To the contrary, Wall presented the officials with significant evidence of his Muslim faith, which the defendants could have accepted without the need to conduct any further investigation on their own.

Finally, we are satisfied that there existed "easy[] [and] obvious alternatives" to the challenged regulation. Id. at 93. This is most plainly seen in the fact that ROSP ultimately changed its policy, which has since allowed Wall and others to observe Ramadan without incident. Additionally, a VDOC guidance document issued June 25, 2010 addressed how inmates who were not on an institution's designated religious pass list could demonstrate eligibility for Ramadan observance. One consideration utilized was past involvement in Ramadan fasting. ROSP, which does not maintain religious pass lists due to its status as a segregation facility, could have utilized the same, less restrictive criterion for determining eligibility.

In sum, viewing the current record in the light most favorable to the plaintiff, the defendants' application of the 2010 Ramadan policy to Wall was unconstitutional. The defendants relied exclusively on a narrow set of parameters

21

while ignoring obvious indications of the sincerity of Wall's beliefs.  The First Amendment demands a more reasoned approach, even within the difficult confines of a prison environment.[15]

**2.**

Having established a claim for a constitutional violation, we must now ask whether the defendants transgressed law that was "clearly established" at the time of the violation.  <u>Ridpath</u>, 447 F.3d at 306.  We conclude that, given Wall's circumstances, his right to participate in Ramadan was clearly established, and the defendants are therefore not entitled to qualified immunity.

As noted, we have previously held that under "the Free Exercise Clause . . . a prisoner has a <u>clearly established</u> . . . right to a diet consistent with his . . . religious scruples, including proper food during Ramadan."  <u>Lovelace</u>, 472 F.3d at 198-99 (emphasis added) (internal quotation marks and citation omitted).  Further, "[a] prison official violates this clearly established right if he intentionally and without sufficient

---

[15] To be clear, we do not decide that prisons may never require some tangible evidence of faith in support of a religious accommodation.  Rather, our reasoning merely restricts prisons from requiring specific physical indicia of faith in the face of significant alternative evidence that an inmate's beliefs are sincere.  Nor do we mean to suggest that bright line rules have no place in governing religious accommodation requests, but only that prison officials may not turn a blind eye to obvious justifications for exceptions when they present themselves so plainly.

justification denies an inmate his religiously mandated diet." Id. at 199. We take these statements to mean quite exactly what they say: that Wall's right to participate in Ramadan was clearly established, and when the defendants abridged this right without first satisfying Turner's reasonableness test, they subjected themselves to the potential for liability. As expressed above, the defendants' application of their policy to Wall was unnecessarily strict. They overlooked (at best) significant evidence that Wall was, in fact, a practicing Muslim who was entitled to participate in Ramadan. We cannot conclude that a reasonable official in the defendants' position, giving proper consideration to our statement in Lovelace that the right is clearly established, and to Turner's objective reasonableness test, would have felt it permissible to apply the policy in so strict a fashion.

The defendants attempt to avoid this rather straightforward result by arguing that there is a lack of case law elucidating exactly how prisons may utilize sincerity tests in determining eligibility for religious accommodations. While it may be true that we have never specifically evaluated a sincerity test,[16]

---

[16] Although not directly on point, we believe the result in Lovelace is relevant for reasons beyond its general affirmation that inmates are entitled to religious dietary accommodations. In that case, we reviewed a prison's policy of removing inmates from its Ramadan list if they were observed breaking the fast (Continued)

23

this argument overlooks the broader right at issue: that inmates are entitled to religious dietary accommodations absent a legitimate reason to the contrary. As we have previously stated, clearly established "includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992). In light of our unequivocal statement in Lovelace that inmates are entitled to religious dietary accommodations, we need not to have previously passed judgment on the appropriateness of particular sincerity tests in order to demand that prison officials act reasonably in administering that right. An expectation of reasonableness in this context is not a high bar, and does not punish officials for "bad guesses in gray areas." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). To the contrary, it offers only a minimal level of

---

even a single time. Lovelace, 472 F.3d at 181. We held that, under RLUIPA's more demanding standard, the policy was not the least restrictive means of furthering the government's interest in efficiently running the prison. Id. at 190-94. Although the policy was intended as a disciplinary measure and the inmate's sincerity was never in question, id. at 187 n. 2, the case remains an example of how a harsh and unyielding policy may be unlawful in the context of clearly protected individual rights. It thus provided at least some degree of guidance to the defendants in this case, if not enough to be dispositive.

24

protection to inmates seeking to exercise their constitutionally protected rights.

Having found that the plaintiff has established a claim for a violation of his clearly established First Amendment rights, we vacate the district court's grant of summary judgment on the plaintiff's First Amendment claim for damages.

## III.

For the reasons explained above, we vacate the district court's decision concluding that (1) the plaintiff's equitable claims are moot, and (2) the defendants are entitled to qualified immunity on the plaintiff's First Amendment damages claim. In so doing, we necessarily find that the plaintiff's claim under RLUIPA survives summary judgment as well, as such claims are evaluated under the same factors, but subject to a less demanding standard of proof. See Lovelace, 472 F.3d at 190. Accordingly, we remand this action to the district court for further proceedings as appropriate.

VACATED AND REMANDED