**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-6523

RANDY BURKE,

Plaintiff − Appellant,

v.

HAROLD CLARKE, Director of the State of Virginia Department of Corrections;
LESLIE FLEMINGS, Warden/Superintendent of the Wallens Ridge State Prison; J.
C. COMBS, Assistant Warden of the Wallens Ridge State Prison; JIMMY
COLLINS, Unit Manager/Supervisor for the A-2 and A-3 Units; DAVID
ROBINSON, Chief of Operations of Virginia Department of Corrections; C. KING,
Lieutenant for the A-2 and A-3 Units; JOHN JABE, Deputy Director of Operations
of Virginia Department of Corrections; ROBERT A. BIVENS, Regional
Ombudsman of Virginia Department of Corrections; BRENDA RAVIZEE,
Institutional Ombudsman and Grievance Coordinator of the Wallens Ridge State
Prison; REBECCA YOUNG, Operation Manager of the Wallens Ridge State Prison;
MARCIA HENSLEY, Treatment Program Supervisor; THOMAS JONES, Law
Library Supervisor at the Wallens Ridge State Prison,

Defendant – Appellees.

Appeal from the United States District Court for the Western of Virginia, at Charleston.
Pamela Meade Sargent, Magistrate Judge. (7:16-cv-00365-PMS)

Argued: October 26, 2020                     Decided: January 14, 2021

Before KING and DIAZ, Circuit Judges, and Stephanie A. GALLAGHER, United States
District Judge for the District of Maryland, sitting by designation.

Affirmed in part, vacated in part, and remanded by unpublished opinion. Judge Diaz wrote the opinion, in which Judge King and Judge Gallagher joined.

**ARGUED:** Daniel Scott Harawa, WASHINGTON UNIVERSITY SCHOOL OF LAW, St. Louis, Missouri, for Appellant. Jessica Merry Samuels, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** Cole Hanzlicek, Student Counsel, Harald Kirn, Student Counsel, Ernest Zhu, Student Counsel, WASHINGTON UNIVERSITY SCHOOL OF LAW, St. Louis, Missouri, for Appellant. Mark R. Herring, Attorney General, Victoria N. Pearson, Deputy Attorney General, Laura Haeberle Cahill, Assistant Attorney General, Toby J. Heytens, Solicitor General, Michelle S. Kallen, Deputy Solicitor General, Martine E. Cicconi, Deputy Solicitor General, Zachary R. Glubiak, John Marshall Fellow, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Randy Burke is an inmate in the custody of the Virginia Department of Corrections ("VDOC"). He keeps his hair in dreadlocks, in accordance with his Rastafarian faith. Because Burke refused to cut his hair, the VDOC placed him in a restrictive housing unit as required by its grooming policy. At various times, the VDOC also denied Burke's requests for religious items, meals, and group services.

Burke sued several VDOC officials in their official and individual capacities under 42 U.S.C. § 1983, challenging the VDOC's grooming policy and the denial of religious accommodations. He claimed that the VDOC violated his religious exercise rights under the First Amendment and the Religious Land Use and Institutionalized Person Act ("RLUIPA") and his equal protection rights under the Fourteenth Amendment.

The district court granted summary judgment to the VDOC, finding that Burke failed to establish that his beliefs are sincere and that VDOC policies imposed a substantial burden on his religious exercise. However, the VDOC now concedes that Burke's beliefs are sincere, and we conclude that the grooming policy imposed a substantial burden on Burke's religious exercise. Because the district court never reached the next step in the RLUIPA analysis, which shifts the burden to the VDOC to demonstrate that its policy was the least restrictive means of furthering a compelling government interest, we vacate the district court's judgment on the RLUIPA claim and remand for further proceedings. We affirm the court's judgment on all other claims.

I.

Burke has been a Rastafarian[1] for over nineteen years and wears his hair in dreadlocks, consistent with his religious beliefs. He's currently serving a sentence for a crime he committed in the Virgin Islands. The Virgin Islands Bureau of Corrections transferred Burke to the VDOC pursuant to a contract between the agencies. The VDOC initially placed Burke in segregation at Red Onion State Prison for refusing to cut his dreadlocks. The VDOC later transferred Burke to Wallens Ridge State Prison.

A.

Upon Burke's arrival at Wallens Ridge, the VDOC ordered Burke to cut his dreadlocks per the grooming policy outlined in VDOC Operating Procedure 864.1, which at that time required general population prisoners to keep their hair short. According to the VDOC, the policy promoted prison security by preventing the concealment of contraband and facilitating the identification of inmates.

The VDOC assigned inmates who refused to cut their hair, including Burke and other practicing Rastafarians, to the Violators Housing Unit. On a list of approved religions maintained by the VDOC, Rastafarianism was the only religion followed by the comment "must follow DOC grooming standards." J.A. 393.

These inmates lived under restrictions not imposed on general population inmates to "encourage compliance" with the grooming policy. J.A. 161. The VDOC confined them

---

[1] Rastafarians believe in the divinity of Ethiopian Emperor Haile Selassie I. As part of their beliefs, they can't cut their hair, and they celebrate King Selassie's birthday and coronation as religious holidays.

4

to solitary cells for 21 hours a day, including for meals, while general population inmates enjoyed up to 13 hours of communal recreation each day. They also couldn't work in the kitchen or the laundry, couldn't attend in-person educational programs, and could only spend $10 a week at the commissary. By contrast, general population inmates could participate in all of those activities and spend up to $50 a week at the commissary.

In July 2019, the VDOC amended its grooming policy and dissolved the Violators Housing Unit. Under the new policy, general population inmates may wear dreadlocks and other long hairstyles.

B.

Operating Procedure 841.3 sets forth the VDOC's protocols for providing "reasonable opportunities" for inmates to "pursue religious beliefs and practices subject to concerns regarding facility security, safety, order, space and resources," and includes procedures for requesting religious items, holidays, and holy day meals. Inmates may purchase approved religious items at the commissary, or request items that have been donated to the prison chaplain. The commissary offers a variety of religious items for sale, including Crucifixes, Stars of David, Sikh Prayer Medallions, Yarmulkes, prayer shawls, incense, religious head coverings and scarves, prayer oils, prayer rugs, drums for spiritual services, tarot cards, Thor's Hammer Medallions, and Wiccan Sea Salt. But no Rastafarian faith items are available for purchase.

If an inmate seeks an item that is not yet approved, he may submit a Request for Approval of Faith Object form. The facility unit head then researches the item and submits a recommendation to a VDOC-wide faith review committee. If the committee approves

5

the item, it's added to the list and made available at the commissary or through the chaplain. Burke never submitted such a request.

The VDOC uses a similar approval procedure for requesting and recognizing religious holidays and providing holy day meals. The availability of meals is based on the faith review committee's determination of "what is nationally recognized." J.A. 430. Several holidays don't have associated religious meals, but all religions except Rastafarianism have at least one holy day meal or group service. The VDOC maintains a master calendar that tracks the religious holidays and their observance. Every quarter, the VDOC Chief of Operations also issues a memorandum regarding the upcoming holy days, as a reminder of what's been approved by the committee.

In an Offender Request form directed to the chaplain, Burke asked for several religious items for Rastafarian worship.[2] J.A. 31. He also requested holy day meals for two Rastafarian holidays already on the master calendar. The chaplain denied the requests, writing, "Can't. Don't have any of this." *Id*.

Burke then exhausted the prison grievance process by submitting an informal complaint, a grievance, and an appeal on the denial of access to items and holiday meals. He addressed the informal complaints to the chaplain and the warden. The chaplain denied the request, stating, "Those items I do not have. All items I have are donated." J.A. 32. The warden denied the request as "[r]epetitive." J.A. 33. The VDOC also denied Burke's

---

[2] This differs from the procedure for requesting approval of religious items not yet available in the prison, for which Burke never submitted a form.

grievance as "[r]epetitive," noting that Burke should request "what materials are approved and available," J.A. 35, and later denied Burke's appeal as well.

C.

Operating Procedure 841.3 also sets out the process for inmate participation in religious group services. Inmates may request new religious group activities for religions recognized by the VDOC. If there is "sufficient offender interest," the VDOC "should consider the request and provide time and space for the group to meet," subject to "restrictions of the facility['s] security level, mission, space, time, available supervision, etc." J.A. 136. Once the service or activity is approved, inmates may sign up using a Request to Attend Religious Services form submitted to the prison chaplain at the facility orientation or during a two-week open enrollment period provided once per calendar quarter.

When Burke was first placed in the Violators Housing Unit, prison officials told him that he may practice his religious faith inside of his cell or meet with the chaplain. Rastafarian group religious services became available in January 2015. Officials told inmates in the Violators Housing Unit that they could participate if they signed up. Burke enrolled and attended. The services consisted of "an empty room with no Rastafarian religious service items [and] no Levi and high priest."[3] J.A. 17.

---

[3] Although unclear from the record, a Levi appears to be a Rastafarian spiritual leader who may direct a group service.

In February 2016, Burke was removed from the pass list for attending group services. This coincided with the establishment of a two-tiered incentive program to encourage compliance with various rules within the Violators Housing Unit by giving inmates more privileges when they moved from Phase I to Phase II. All inmates, including Burke, started in Phase I and had to comply with all mandated programming and cell compliance requirements for a minimum of six months before consideration for placement in Phase II. However, both categories of inmates could attend group services. Burke submitted an informal complaint stating that he had not received a hearing regarding his sudden ineligibility to attend services. The VDOC responded that no formal hearing process existed and that he only needed to sign up with the chaplain to participate.

Burke didn't submit a Request to Attend Religious Services form to the chaplain. Instead, he filed a grievance, arguing that he was already on the participation list from the prior year. The VDOC denied the grievance and the subsequent appeal.

In August 2016, prison policy changed so that only Phase II prisoners could participate in group services. Burke was reclassified as Phase II, which meant that he wouldn't be affected by the change. But Burke refused to share a cell with another offender, as is required of Phase II inmates. From October 2016 until the Violators Housing Unit was abolished in July 2019, Burke was again reclassified as Phase I and couldn't attend group services. According to the VDOC, if Burke had accepted a cellmate, he could have moved to Phase II and attended services at any time.

D.

Burke filed a pro se complaint against various VDOC personnel in their official and individual capacities under 42 U.S.C. § 1983 and RLUIPA, 42 U.S.C. § 2000cc-1. He identified various officials as responsible for "the Violators Housing Units for people who refuse to cut their hair because of Rastafarian religious beliefs." J.A. 13 ¶ 4, 14 ¶ 6. He also alleged that he was placed in segregation "for not being in compliance" with the grooming policy "because of [his] dreadlocks," J.A. 15 ¶ 16, and that the VDOC should have evaluated whether his "beliefs and practices would be burdened" by the grooming policy, J.A. 16 ¶ 21–22.

Burke then laid out his legal claims, two of which are relevant to this appeal. First, Burke alleged a violation of the Equal Protection Clause because the VDOC denied him access to "religious group services and religious service items/holy day meals" and "vocational/educational programs," unlike the prisoners who abided by the grooming policy. J.A. 21–22 ¶ 53, 56. Second, he alleged that the VDOC violated the Free Exercise Clause and RLUIPA by "utilizing Operating Procedure 864.1 [the grooming policy] as a reason to continuously deny [his] access to Rastafarian religious group services, Rastafarian religious service items/holy day meals, educational/and vocational programs and access to [up-to-date] Virgin Islands laws" at the law library, which he needed to prepare a habeas petition. J.A. 23 ¶ 61. Burke sought declaratory relief, injunctive relief, and monetary damages.

The VDOC moved for summary judgment. The district court denied summary judgment on the RLUIPA and First Amendment claims, holding that the VDOC's policies

9

as described by Burke constituted a "substantial burden" on his religious exercise. J.A. 306. The court also denied summary judgment to the Chief of Operations for the VDOC in his individual capacity and to all of the defendants in their official capacities on Burke's equal protection claim alleging that VDOC refused to provide religious meals, items, and group services to Rastafarians despite providing such accommodations to adherents of other religions. However, the court determined that the defendants (other than the Chief of Operations) were entitled to qualified immunity on the claim and granted them summary judgment in their individual capacities. Additionally, the court granted summary judgment to the VDOC on Burke's separate equal protection claim alleging a "disparity between conditions and programs afforded inmates in general population versus in the [Violators Housing Unit]" because those who comply with the grooming policy aren't similarly situated with those who don't. J.A. 307–308.[4]

The VDOC later filed a second motion for summary judgment, which a magistrate judge granted before entering judgment for the defendants on all remaining claims.[5] The magistrate judge found the § 1983 claims against the defendants in their individual capacities unavailing because Burke "ha[d] not provided evidence that any of these defendants," including the Chief of Operations, "had responsibility for formulating" the

---

[4] The district court also denied summary judgment on another equal protection claim, this one alleging that prisoners from the Virgin Islands who were housed in the Violators Housing Unit were denied equal access to educational and vocational programming. As discussed infra, a magistrate judge later granted summary judgment on the claim, and Burke has not appealed that ruling.

[5] The parties consented to the jurisdiction of the magistrate judge.

10

challenged policies. J.A. 502. The magistrate judge also found the religious exercise claims meritless because Burke "offered no evidence as to his sincerely held religious belief" or to "any substantial burden on the free exercise of his religious beliefs, other than to make conclusory allegations." *Id.* The magistrate judge granted summary judgment to the VDOC on the remaining equal protection claims because Burke hadn't shown that he properly requested religious accommodations and he "offered no evidence" that he suffered unequal treatment as compared to similarly situated inmates. J.A. 503.

This appeal followed.

## II.

Burke makes two arguments on appeal. First, he contends that the grooming policy violated his religious exercise rights under RLUIPA and the First Amendment's Free Exercise Clause by putting him to an "impossible choice: cut his dreadlocks and violate his faith, or endure the punitive segregation" of the Violators Housing Unit. Appellant's Br. at 1. Second, he argues that the grooming policy and the VDOC's disallowance of Rastafarian religious practice violated his rights under the Fourteenth Amendment's Equal Protection Clause.

As we explain, because Burke has shown that the grooming policy imposed a substantial burden on his religious exercise, we vacate the district court's entry of summary judgment for the VDOC on the RLUIPA claim. We otherwise affirm the court's judgment.

11

## A.

We review an order granting summary judgment de novo, interpreting the evidence "in the light most favorable to the nonmoving party." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (cleaned up). Summary judgment is appropriate if there is "no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).

## B.

We first consider whether Burke preserved the "impossible choice" argument he now makes on appeal. To properly preserve the claim, he had to raise it twice before: first, in the prison administrative grievance process under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a); and second, "in the district court below," *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993).

The VDOC contests only the second step, thereby waiving the Act's exhaustion requirement. *See* Oral Argument at 18:31–40 (counsel agreeing that "this is not an appeal about exhaustion, it's about failing to plead in the district court"); *see also Jones v. Bock*, 549 U.S. 199, 204 (2007) (holding that failure to exhaust under the [Act] is "an affirmative defense that the defendant must plead and prove"). Thus, we need only look to the record in the district court. In doing so, we focus "on discerning the expressed intent of the litigant." *Williams v. Ozmint*, 716 F.3d 801, 811 (4th Cir. 2013).

As described above, Burke discussed the grooming policy several times in his complaint. Although the mention is brief, and made in connection with Burke's time at Red Onion State Prison, Burke asserted that he was subject to restrictions due to the

12

grooming policy, and that he was subject to the policy only because of his Rastafarian beliefs. This captures the essence of the "impossible choice" argument: that Burke had to violate his faith and comply with the grooming policy or suffer the consequences.

Burke also explicitly alleged that the grooming policy burdened his religious exercise and violated his rights under the First Amendment and RLUIPA. In doing so, he linked the grooming policy to some restrictions that were specific to the Violators Housing Unit and thus part of the "impossible choice" (such as his inability to access certain educational and vocational programming), but he also referred to some policies applicable to all VDOC institutions that don't fit into the "impossible choice" framework (such as his inability to access religious items, meals, and services).

Nonetheless, given that we liberally construe pro se pleadings, particularly when the plaintiff "raises civil rights issues," *see DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018), we think that Burke's complaint sufficiently preserved his "impossible choice" argument for appeal.[6]

---

[6] The VDOC also points out that the district court never directly addressed Burke's challenge to the grooming policy. This raises a separate issue. We have an "independent obligation to verify the existence of appellate jurisdiction," which "is limited to appeals from final decisions of the district courts." *Porter v. Zook*, 803 F.3d 694, 696 (4th Cir. 2015) (cleaned up). "[I]f it appears from the record that the district court has not adjudicated all of the issues in a case, then there is no final order." *Id.* Although the district court didn't explicitly address the grooming policy, the magistrate judge dispensed with all religious exercise claims when she held that Burke failed to show that his beliefs are sincerely held. Thus, we have jurisdiction over this appeal.

## C.

We next address whether (as the VDOC asserts) Burke's challenge to the grooming policy is moot because the policy has since been amended and the Violator Housing Unit dissolved. We hold that Burke's religious exercise claims remain live under the voluntary cessation doctrine.

The voluntary cessation doctrine requires the VDOC to show that it's "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" for its voluntary cessation of an activity to moot a legal challenge. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The VDOC has failed to meet this high burden.

Although the VDOC "disclaim[s] any intention" of returning to its old policy, it also insists that it retains the authority to revise the grooming policy, does so every three years, Appellee's Br. at 33, and doesn't concede that the old policy was unlawful. Because the VDOC may return to its former practices at any time, Burke's claims are not moot. *See Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) ("[W]hen a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot.").

## D.

We now turn to Burke's First Amendment and RLUIPA claims. Contrary to the view of the district court, we conclude that Burke has alleged a genuine dispute of material fact on whether the grooming policy substantially burdened his religious exercise.

14

As a threshold matter, under the First Amendment and RLUIPA, Burke must show that "(1) he [held] a sincere religious belief; and (2) a prison practice or policy place[d] a substantial burden on his ability to practice his religion." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018). The magistrate judge ruled that Burke failed to show that his religious beliefs are sincere. However, the VDOC has since conceded that the magistrate judge erred in so finding and that Burke has "introduced sufficient evidence of the sincerity of his beliefs to survive summary judgment." Appellee's Br. at 36 n.8.

Having failed to accept Burke's beliefs as sincere, the magistrate judge never considered whether the grooming policy constitutes a substantial burden on Burke's religious exercise. However, this court has previously held, with respect to this very grooming policy, that "removing privileges in an effort to compel compliance, despite not physically forcing an inmate to cut his hair, qualifies as a substantial burden." *Greenhill v. Clarke*, 944 F.3d 243, 252 (4th Cir. 2019) (cleaned up) (quoting *Couch v. Jabe*, 679 F.3d 197, 200–01 (4th Cir. 2012)).

For the RLUIPA claim, the burden now shifts to the VDOC to justify the policy as "the least restrictive means of furthering a compelling governmental interest." *See id.* at 250. Because the district court never reached this inquiry, we vacate the court's judgment on the RLUIPA claim and remand so that the district court can complete the analysis. *Id.* at 252–54. We note, however, that even if the district court finds a violation under RLUIPA, Burke can obtain only equitable relief. *See Sossamon v. Texas*, 563 U.S. 277, 288 (2011) ("[RLUIPA] does not include suits for damages against a State."); *Rendelman*

15

*v. Rouse*, 569 F.3d 182, 184 (4th Cir. 2009) ("RLUIPA does not authorize a claim for money damages against an official sued in her individual capacity.").

There's no need for the district court to reconsider its ruling regarding Burke's First Amendment claim. For starters, any grant of equitable relief under the Free Exercise Clause would be coextensive with what Burke seeks under RLUIPA, and the latter affords Burke the benefit of strict scrutiny review, which is more plaintiff-friendly than the standard laid out in *Turner v. Safley*, 482 U.S. 78 (1987), for a prisoner's free exercise claim. *See Gentry v. Robinson,* ___ F. App'x ___, 2020 WL 7181318, at *6 n.3 (4th Cir. Dec. 7, 2020) (citing *Wall*, 741 F.3d at 499 n.10).

And Burke can't recover First Amendment damages from the defendants in their official capacities because Virginia hasn't waived its Eleventh Amendment immunity, *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). He also can't recover damages from the defendants in their individual capacities because of qualified immunity, which "shields public officers performing discretionary duties from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Lovelace v. Lee*, 472 F.3d 174, 196 (4th Cir. 2006) (cleaned up).

In his Reply Brief, Burke argues that the VDOC waived any argument as to qualified immunity. But this is backwards. The magistrate judge held that all of the defendants, including the Chief of Operations, were entitled to qualified immunity. Thus, by failing to argue against this ruling in his Opening Brief, Burke is the one who waived arguments against qualified immunity for all defendants. *See Grayson O Co. v. Agadir Int'l LLC*, 856

16

F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief.").

Even if Burke hadn't waived the argument, the VDOC's reference to qualified immunity in its Response Brief, although short, is sufficient to preserve the defense. *See Brown v. Nucor Corp.*, 785 F.3d 895, 919 (4th Cir. 2015) (describing a heading as insufficient and an eight-line footnote as sufficient). The VDOC specifically argues that "the lack of any clearly established law at the time of the relevant conduct would almost certainly prevent Burke from overcoming" the VDOC officials' qualified immunity. Appellee's Br. at 35 n.7.

We agree with the VDOC. No precedent "would have put a reasonable prison official on notice, at the time of the relevant events, that VDOC's grooming policy violated the Free Exercise Clause . . . . If anything, the precedent that existed at the time pointed in the opposite direction." *Gentry*, 2020 WL 7181318, at *6 (citing *Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 358 (4th Cir. 1998)). Thus, we affirm the district court's ruling that the defendants are entitled to qualified immunity for the First Amendment damages claim.

E.

Finally, we reach Burke's equal protection claims. "To succeed on [such a] claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Burke makes two equal protection arguments. First, he says that "Rastafarians suffered different and more severe conditions in the [Violators Housing Unit] [than] their general

17

population counterparts because of the grooming policy, which effectively categorized prisoners on the basis of religion." Appellant's Br. at 33. Second, he contends that Rastafarians were "treated differently than similarly situated inmates of other religions when the VDOC denied Rastafarian inmates the opportunities for religious exercise that it afforded to inmates of other religions." *Id.* at 37. We affirm the district court's judgment in favor of the VDOC because Burke failed to establish that he was treated differently from those similarly situated or that the unequal treatment was the result of intentional discrimination.

Burke admits that the grooming policy is facially neutral but argues that it was discriminatory as applied to Rastafarians, who have no choice but to violate the grooming policy due to their religious beliefs. Burke contends that he was similarly situated to general population inmates in all relevant respects upon intake and that the grooming policy forced him into a different position due to his religious beliefs.

But it wasn't solely Burke's religion that differentiated him from general population inmates; it was also his dreadlocks. Long hair makes it possible for inmates to hide contraband in their hair and makes it more difficult for prison officials to identify inmates. Thus, long-haired and short-haired prisoners are not similarly situated. Because Burke hasn't shown that he was treated differently from other long-haired prisoners—with whom he *is* similarly situated for purposes of the grooming policy—his equal protection claim fails. That wearing long hair wasn't a "choice" for Rastafarian prisoners, Reply Br. at 12, indicates that the policy constituted a substantial burden on religious exercise, but not that Burke was similarly situated to short-haired prisoners.

18

Burke's equal protection claim also fails for a separate reason—he hasn't shown that the grooming policy intentionally discriminates between Rastafarian and other prisoners. Burke alleges that the VDOC used the grooming policy to discriminate based on (1) the notation on the list of approved religions stating that Rastafarians "must follow DOC grooming standards," J.A. 393; and (2) allegations in another case against the VDOC that "at least one VDOC official believed that the Violators Housing Unit was reserved exclusively for the segregation of Rastafarians," Appellant's Br. at 35 n.12.

But neither allegation shows that the VDOC applied the grooming policy to Burke *because* he was Rastafarian. *See Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 821 (4th Cir. 1995) ("[W]e must determine whether . . . [defendant] denied [the] application *because* [the plaintiff] was a Czech immigrant . . . . [T]he use of the classification must be clear and intentional." (emphasis added)). They merely show that some VDOC officials recognized that the grooming policy had a discriminatory impact on Rastafarians. This is not enough to make out an equal protection claim. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

Burke also argues that the VDOC's pattern of denying Rastafarians access to religious items, group services, and holy day meals is a violation of the Equal Protection Clause. For this claim, Burke is similarly situated to all other religious prisoners in VDOC facilities, as they are all subject to the same VDOC policies regarding such religious practice. But again, Burke fails to establish that the VDOC applied the policy with discriminatory intent against Rastafarians.

19

When relying on a pattern of discriminatory behavior, the plaintiff must show "a clear pattern, unexplainable on grounds other than" the suspect classification or additional evidence of discriminatory intent. *Id.* at 266. Burke argues that the lack of Rastafarian religious items on the approved items list and the unavailability of a Rastafarian celebration apart from the general population (which every other approved religion has on at least one holiday during the year) suggests discrimination against Rastafarians because the VDOC has "housed Rastafarian inmates from the Virgin Islands since the inception of the contractual agreement in 2001." Reply Br. at 15.

In our view, this anomaly is easily explainable on grounds other than discrimination against Rastafarianism: it's possible that no Rastafarian has properly applied for such items, services, or holiday meals under the relevant VDOC procedures. We can't infer that the VDOC intentionally discriminated against Rastafarians if Burke hasn't shown that either Rastafarians requested religious accommodations in the same way as practitioners of other faiths, and Rastafarians were uniquely denied; or alternatively, that non-Rastafarian prisoners were able to obtain religious accommodations without submitting the appropriate forms, and Rastafarians were uniquely required to file them.

This lack of evidence is fatal to Burke's claim. Burke must at least offer facts that "tend to exclude the possibility" of nondiscriminatory conduct. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (cleaned up). "In the absence of such evidence, there is no 'genuine issue for trial,'" and the VDOC is entitled to summary judgment. *Id.* at 598; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The judge's inquiry, therefore, unavoidably asks . . . whether there is evidence upon

20

which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.") (cleaned up); *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) ("Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.").

Burke complains that he couldn't follow the proper procedures because no VDOC official ever pointed him to the correct forms.[7] That's not entirely true. The VDOC informed Burke that he should "send [an] open enrollment form" and "writ[e]" to the chaplain to sign up for group services, which was the proper procedure for that activity. J.A. 40, 42. And even when prison officials didn't direct Burke to the correct forms, they didn't mislead him about what steps to take. When Burke asked the chaplain for religious items, the chaplain told Burke that he didn't have those items and that the items he had were donated, per the operating procedures. Additionally, Operating Procedure 841.3 is marked "Yes" for "Incarcerated Inmate Access" and would have directed Burke to the proper forms for his requests for religious accommodations. *See, e.g.*, J.A. 126–40. Burke failed to demonstrate that any VDOC procedure was practically unavailable to him; i.e., that the procedures "operate[d] as a dead end," were so opaque that they were "incapable

---

[7] Burke also argues that that the sample Request to Attend to Religious Services form doesn't include services for Rastafarians. However, the form clearly notes that it should be modified by each facility to include the religious services available at that particular facility. Burke hasn't shown that a Rastafarian service option wasn't available on the relevant form, i.e., the one at Wallens Ridge.

21

of use," or VDOC officials actively "thwart[ed] inmates from taking advantage" of a process, *Ross v. Blake*, 136 S. Ct. 1850, 1859–60 (2016).

In any event, an inmate's inability to follow procedures doesn't make out an equal protection claim unless discrimination was the cause. Burke hasn't shown that any procedure for religious accommodations was unavailable to him *because* he's Rastafarian. Without such a showing, and without any other evidence of intentional discrimination, Burke's equal protection claims fail.

\* \* \*

For the foregoing reasons, we vacate that portion of the district court's order granting summary judgment to the VDOC officials on the RLUIPA claim for equitable relief, and remand for further proceedings. We otherwise affirm the district court's judgment.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*