**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-6382**

ADRIAN F. KING, JR.,

                    Plaintiff - Appellant,

          v.

JIM RUBENSTEIN, Commissioner; MARVIN C. PLUMLEY, Warden;
DIANNE R. MILLER, Associate Warden Programs/Housing;
SERGEANT GROVER ROSENCRANCE, Deputy Warden; LESTER THOMPSON,
Unit Manager E-1 Segregation; SHERRI DAVIS, Unit Manager
E-2 Segregation; STACY SCOTT, Supervised Psychologist/Ad
Seg Board; MIKE SMITH, SR., Unit Manager Ad Seg Board;
SAMANTHA GSELL, Case Manager Ad Seg Board; ADAM SMITH, Unit
Manager/Ad Seg Board Chairman; CLIFF GOODIN, Head
Psychologist, in their official and personal capacities,

                    Defendants - Appellees.

Appeal from the United States District Court for the Northern
District of West Virginia, at Martinsburg.  Gina M. Groh, Chief
District Judge.  (3:14-cv-00042-GMG-JSK)

Argued:  January 27, 2016              Decided:  June 7, 2016

Before GREGORY, DUNCAN, and FLOYD, Circuit Judges.

Affirmed in part, reversed, vacated, and remanded in part by
published opinion.  Judge Gregory wrote the opinion, in which
Judge Duncan and Judge Floyd joined.

**ARGUED:**  Tennille Jo Checkovich, MCGUIREWOODS LLP, Richmond,
Virginia, for Appellant.  Natalie C. Schaefer, SHUMAN, MCCUSKEY

& SLICER, PLLC, Charleston, West Virginia, for Appellees. **ON BRIEF:** Michael W. Stark, MCGUIREWOODS LLP, Richmond, Virginia, for Appellant. Kimberly M. Bandy, SHUMAN, MCCUSKEY & SLICER, PLLC, Charleston, West Virginia, for Appellees Jim Rubenstein, Marvin C. Plumley, Dianne R. Miller, Grover Rosencrance, Lester Thompson, Sherri Davis, Mike Smith, Sr., Samantha Gsell, and Adam Smith.

————————————

GREGORY, Circuit Judge:

Adrian F. King, Jr. appeals the district court's dismissal of his complaint for failure to state a claim. King filed suit under 42 U.S.C. § 1983 against several correctional officers, medical personnel, and prison administrators for alleged violations of his constitutional rights after he underwent surgery to remove penile implants while incarcerated. We conclude that King's complaint properly stated his Fourth, Eighth, and Fourteenth Amendment Equal Protection and Due Process claims. We also hold that King stated a claim against Marvin Plumley. We reverse the district court's decision on those bases, vacate the dismissal, and remand the case for further proceedings. We affirm the dismissal as to Stacy Scott, Cliff Goodin, and Jim Rubenstein, but modify the dismissal of the latter two to be without prejudice.

I.

In reviewing a dismissal for failure to state a claim, we accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff. E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011). We may consider additional documents attached to the complaint or the motion to dismiss "so long as they are integral to the complaint and authentic."

Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Here, we look to King's complaint, including his attached statement of claims, and his notice of claim, including the grievance attachment, all filed pro se, in laying out the following factual allegations.

a.

King is an inmate at Huttonsville Correctional Center ("HCC") and has been incarcerated since March 23, 2012. In fall 2008, prior to his incarceration, King had marbles implanted in and tattoos drawn on his penis. He and his then fiancée, who is now deceased, decided to have the implants done during the "body modification" craze, as they had heard about the "intensification of sensitivity and euphoric climaxes" resulting from the procedure. J.A. 16.

On January 8, 2013, King was called to the control booth in his unit, where a corrections officer told him to report to "medical" to be examined. Id. at 25. King was to be examined because an inmate reported seeing King and another inmate implanting marbles into their penises. The nurse who examined King verified that the marbles were not recently implanted and that there was no sign of infection.

King was escorted to the segregation unit, where an officer told him that the implants were not noted in his file. King responded that when he was being processed at Mt. Olive, he

4

informed the processing officer of the marbles and tattoo.  The officer told him, "This isn't a pornographic camera, put [your] clothes back on."  Id.

King was subsequently found in violation of Policy Directive 325.00-1.26, which prohibits exposing body fluids, tattoos, and piercings.  The policy states:

> 1.26—Exposing Body Fluids/Tattooing/Piercing:  No inmate shall intentionally expose to any person body fluids such as urine, feces, spit, blood, or any other body fluid.  No inmate shall give oneself or others a tattoo/piercing or allow another inmate to give him/her a tattoo/piercing.  No inmate shall possess any tattooing/piercing equipment, to include, tattooing ink, tattooing patterns, tattooing needles, etc.

King Br. 24.  Due to this violation, King was sentenced to sixty days of punitive segregation, sixty days loss of privileges, and ninety days of loss of good time.

While King was in segregation, Sherri Davis, the unit manager of segregation unit E-2, brought King to her office. There, she had King sign a piece of paper without giving him the opportunity to read it.  Davis told him that he was signing consent papers to go to Ruby Memorial Medical Center to have a doctor examine his implants and, if necessary, remove them. King was taken to Ruby Memorial, where he was examined by Dr. Henry Fooks, Jr.  Fooks determined that the implants were not recently inserted and that there was no medical need to remove them.  When King was transported back to HCC, Deputy Warden

5

Grover Rosencrance told him, "Get comfortable you stupid Son of a Bitch, you'll be placed in Administrative Segregation until you do as I say and have those marbles removed." J.A. 26. King responded that Rosencrance could not punish him twice for the same violation. Rosencrance said, "I can do what the Fuck I want." Id. King was then returned to administrative segregation. King alleges that HCC officials threatened him with segregation for the remainder of his sentence and loss of parole eligibility if he did not consent to surgery.

On June 19, 2013, King "gave in" and let them remove the marbles at Ruby Memorial. Id. The surgery was done "practically against [his] will as [he] was coerced by the administration because of the threats they made" about continued segregation and loss of parole eligibility. Id. at 31.

As a result of the surgery, King now experiences physical symptoms. He has tingling and numbness in his penis; pain in the area where the marbles were removed; an "uncomfortable, stretching feeling where the cut was made"; pain in his penis when it rains, snows, or gets cold; and "stabbing pain [that] shoots into [his] stomach" if he bumps into something or the scar on his penis is touched. Id. at 15, 27. King never experienced these symptoms until after his implants were removed.

6

King also experiences mental and emotional anguish as a result of the surgery. He gets "very depressed every time [he] shower[s] or urinate[s]" because he sees the scarring and is reminded of his deceased fiancée. Id. at 15. He worries about "the possibilities that [his] penis will still be numb when [he] . . . is with another woman" and about how he will explain what happened if in the future someone is "sickened by the scarring." Id. at 16. Additionally, King is unable to urinate when any of his five roommates are in the cell with him, a problem he did not previously experience. He is also frightened every time he sees any of the defendants. He is ridiculed by the staff: they refer to him as "Marble Man" and when they search him, they ask where his marbles are. Id. at 15. Correctional officers make "[h]omosexual remarks" when they see him. Id. He also now has gay inmates approach him, because of the way the staff have gossiped about him. These inmates ask him questions that make him feel uncomfortable and "place [him] in a compromising situation, where it is a strong possibility that a physical confrontation" might occur. Id. at 17.

b.

King originally filed suit under 42 U.S.C. § 1983 in the Circuit Court of Kanawha County, West Virginia. His complaint named as defendants Jim Rubenstein (Commissioner), Warden Marvin Plumley, Dianne R. Miller (Associate Warden Programs/Housing),

7

Deputy Warden Rosencrance, Lester Thompson (Unit Manager E-1 Segregation), Sherri Davis, Stacy Scott (Supervised Psychologist/Ad Seg Board), Mike Smith, Sr. (Unit Manager, Ad Seg Board), Samantha Gsell (Case Manager Ad Seg Board), Adam Smith (Unit Manager Ad Sec Board Chairman), and Cliff Goodin (Head Psychologist). A circuit court judge in the Circuit Court of Kanawha County, West Virginia, reviewed the initial pleadings and found that the complaint was not "frivolous, malicious or fails to state a claim," and accordingly had the clerk issue process against the defendants. Id. at 33. The defendants removed the case to the U.S. District Court for the Southern District of West Virginia and moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The case was transferred to the Northern District of West Virginia, where a magistrate judge entered his report and recommendation on the motion to dismiss. Both sides filed objections; only the defendants filed responses. The district court rejected in part and adopted in part the magistrate's recommendation and granted the defendants' motion to dismiss in full. King timely appeals.

## II.

This Court reviews de novo the grant of a motion to dismiss. Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 768 (4th Cir. 2011). A Rule 12(b)(6) motion tests the

8

sufficiency of a complaint; it does not, however, "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999) (quoting Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992)). To survive a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level"— that is, the complaint must contain "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). Bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Nevertheless, pro se pleadings are "to be liberally construed," and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

### III.

King appeals the dismissal of his substantive claims, as well as the dismissal of Scott, Plumley, Rubenstein, and Goodin.

9

a.

King first claims that the district court improperly dismissed his Fourth Amendment claim. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The applicability of the Fourth Amendment turns on whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." Hudson v. Palmer, 468 U.S. 517, 525 (1984) (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).

In Hudson, the Supreme Court held that an inmate has no reasonable expectation of privacy, and thus no Fourth Amendment protection, in his prison cell, given "the paramount interest in institutional security." Id. at 528. While "imprisonment carries with it the circumscription or loss of many significant rights," the Supreme Court nevertheless cautioned that "prisons are not beyond the reach of the Constitution." Id. at 523-24. Indeed, five years earlier in Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court "developed a flexible test to determine the reasonableness of a broad range of sexually invasive searches . . . ." United States v. Edwards, 666 F.3d 877, 883 (4th Cir. 2011) (citation and internal quotation marks omitted). Under Wolfish, a court is to consider the following

10

factors to determine the reasonableness of the search: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. at 559.

This Court has previously "assum[ed] that the Fourth Amendment continues to apply to lawfully confined prisoners" before weighing the competing interests to determine the reasonableness of a search. E.g., Jones v. Murray, 962 F.2d 302, 307 (4th Cir. 1992). As the district court noted, "nothing in Hudson indicates the Supreme Court intended to abrogate a prisoner's expectation of privacy beyond his cell." J.A. 171. And we agree with our sister circuits that, under Wolfish, prisoners retain an interest in some degree of bodily privacy and integrity after Hudson. See King v. McCarty, 781 F.3d 889, 900 (7th Cir. 2015) (per curiam) ("Even in prison, case law indicates that the Fourth Amendment protects, to some degree, prisoners' bodily integrity against unreasonable intrusions into their bodies."); Sanchez v. Pereira-Castillo, 590 F.3d 31, 42 & n.5 (1st Cir. 2009) ("We have recognized that a limited right to bodily privacy against searches is not incompatible with incarceration."); Thompson v. Souza, 111 F.3d 694, 699 (9th Cir. 1997) ("Notwithstanding the language in Hudson, our circuit has held that the Fourth Amendment right of people to be secure against unreasonable searches and seizures extends to

11

incarcerated prisoners . . . ." (internal quotations omitted));

Elliott v. Lynn, 38 F.3d 188, 191 n.3 (5th Cir. 1994) (same);

Cornwell v. Dahlberg, 963 F.2d 912, 916 (6th Cir. 1992) ("[A] convicted prisoner maintains some reasonable expectations of privacy while in prison . . . even though those privacy rights may be less than those enjoyed by non-prisoners."); Covino v. Patrissi, 967 F.2d 73, 78 (2d Cir. 1992) (holding that despite Hudson, "inmates do retain a limited right to bodily privacy"); Dunn v. White, 880 F.2d 1188, 1191 (10th Cir. 1989) (same); Spence v. Farrier, 807 F.2d 753 (8th Cir. 1986) (citing Wolfish and applying traditional Fourth Amendment analysis to prisoner's claim). Accordingly, King maintains some legitimate expectation of privacy in his person.

We hold that the Wolfish factors weigh against reasonableness and thus reverse the district court's dismissal of King's complaint. As to the first factor, the scope of the intrusion, the surgery was beneath the skin into a sensitive, private body part—it was certainly not "commonplace." See Sanchez, 590 F.3d at 45. Unlike the blood test in Schmerber v. California, 384 U.S. 757 (1966), this surgery involved "risk, trauma, [and] pain": King alleged scarring and botched incisions, pain and tingling, and emotional anguish. See 384 U.S. at 771; see also Winston v. Lee, 470 U.S. 753 (1985) (holding, outside of the prison context, that Virginia could not

12

compel surgery to remove a bullet from a suspect's chest, in part because of the risk, trauma, and pain involved in the procedure); Sanchez, 590 F.3d at 45 (finding scope egregious where plaintiff alleged that he was "slashed and mutilated" during surgery, that his "life and health were jeopardized," and that he experienced "severe physical and emotional pain" as a result). The interest in bodily integrity involves the "most personal and deep-rooted expectations of privacy," Lee, 470 U.S. at 760, and here, the nature of the surgery itself—surgery into King's penis—counsels against reasonableness.

The district court acknowledged the "unusual" nature of the surgery but found that King "precipitated [it] by electing the unusual insertion of marbles into his penis" in the first instance. J.A. 177. That King decided to have marbles inserted into his penis, however, is of no moment; the scope of the intrusion is not a subjective inquiry. See, e.g., United States v. Fowlkes, 804 F.3d 954, 963 (9th Cir. 2015) (finding the scope suggested unreasonability where officers physically extracted a plastic bag containing contraband from defendant's rectum, making no mention that defendant had presumably inserted it himself); Rodriques v. Furtado, 950 F.2d 805, 811 (1st Cir. 1991) (finding a warrant-authorized vaginal-cavity search "extreme," again not considering that plaintiff inserted the

13

contraband herself).  We find the scope of the intrusion objectively extreme.

The second factor, the manner in which the search was conducted, also favors finding the search unreasonable.  "[O]nce contraband is discovered in the course of a sexually invasive search, the contraband may not be seized in a manner that poses an unnecessary risk of harm to the person being searched."  Edwards, 666 F.3d at 885.  Again, King alleged that the surgery left him scarred, with pain and emotional anguish.  We agree with the district court that "the surgery posed a risk to King's health and caused him trauma and pain."  J.A. 176.

Turning to the third factor, the defendants correctly contend that they have an interest in controlling contraband within the prison for the health and security of the inmates. The Supreme Court has long recognized the need to "guarantee the safety" of the prison community, administrators, inmates, and visitors alike.  Hudson, 468 U.S. at 527.  Indeed, "prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." Turner v. Safley, 482 U.S. 78, 89 (1987) (quoting Jones v. N.C. Prisoners' Union, 433 U.S. 119, 128 (1977)) (alterations in original).  "In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their

14

policies are an unnecessary or unjustified response to problems of jail security." Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 132 S. Ct. 1510, 1513-14 (2012).

Nevertheless, searches conducted "in an abusive fashion . . . cannot be condoned." Wolfish, 441 U.S. at 560 (internal citation omitted). Instead, the "'deference' that is afforded to prison administrators 'does not insulate from review actions taken in bad faith and for no legitimate purpose.'" Williams v. Benjamin, 77 F.3d 756, 765 (4th Cir. 1996) (quoting Whitley v. Albers, 475 U.S. 312, 322 (1986)) (considering an Eighth Amendment claim); see also Hudson, 468 U.S. at 528 ("[I]ntentional harassment of even the most hardened criminals cannot be tolerated by a civilized society.").

Throughout his complaint, King stated that the defendants had no penological justification in the surgery, J.A. 16, 18, and provided facts that support this contention. First, he alleged that the marbles were implanted prior to incarceration (an allegation supported by the findings of the two medical professionals who inspected the marbles). This, he argues, is inconsistent with the policy directive that he was found in violation of:

> 1.26—Exposing Body Fluids/Tattooing/Piercing: No inmate shall intentionally expose to any person body fluids such as urine, feces, spit, blood, or any other body fluid. No inmate shall give oneself or others a tattoo/piercing or allow another inmate to give

15

> him/her a tattoo/piercing. No inmate shall possess any tattooing/piercing equipment, to include, tattooing ink, tattooing patterns, tattooing needles, etc.

Id. at 24. While the defendants contested the timing of the insertion of King's implants at oral argument, at this stage, we draw all reasonable inferences in King's favor. E.I. du Pont de Nemours & Co., 637 F.3d at 440. Accordingly, King already had the implants and was not exposing blood by inserting the marbles at the time of the violation.

King also alleged that other prisoners "implanted foreign objects into their penises," but unlike King, they have been permitted to keep them. J.A. 27. King noted that some of these inmates have "even had it done while incarcerated." Id. at 17. The defendants point to King's examples of other inmates as proof that this practice is not an isolated occurrence, contending that "inmates have now devised an additional place to potentially conceal contraband: beneath their skin." Appellees' Br. 18-19. King alleges, however, that the staff knew of this behavior and "caught, charged and convicted" other inmates but did not require them to surgically remove their implants. J.A. 17. These allegations contradict the defendants' arguments that prison officials are to detect and prevent this behavior and that a general ban is preferable to carving out exceptions for individual inmates. Appellee's Br.

16

19-20 (citing Florence, 132 S. Ct. at 1516; Hudson, 468 U.S. at 527). And while not conclusive, these allegations lend support to King's argument that the officers' actions here were meant to harass.

Finally, the argument that King consented to the surgery does not provide cover for the defendants. As in Sanchez, King raised allegations that his consent was not freely given. E.g., J.A. 15 ("I was threatened with Administrative Segregation until I discharge my sentence, if I did not consent to the surgery to have my 'Professionally Implanted Marbles' removed."); id. at 25-26 (describing under what conditions he was placed in segregation, including keeping him in segregation "under 'False Pretenses'"); id. at 27 ("I was FORCED with the use of MENTAL TORTURE and UNLAWFUL SEGREGATION to remove my implants that were professionally done."); see Sanchez, 590 F.3d at 46-47. "'Consent' that is the product of official intimidation or harassment is not consent at all." Florida v. Bostick, 501 U.S. 429, 438 (1991). Based on King's complaint, his consent to surgery was not "voluntarily given, and [instead] the result of duress or coercion, express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973).

While prison officials must be afforded wide deference in deterring security threats, the pleadings raise sufficient concerns about the legitimacy of the reasons for surgery. This

17

is doubly so where defendants sought "to intrude upon an area in which our society recognizes a significantly heightened privacy interest," requiring "a more substantial justification" to make the search "reasonable." Lee, 470 U.S. at 767. Thus, at this early stage of the proceedings, we find that the justification for the search weighs in favor of unreasonableness.

The fact that the search occurred in a hospital does not trump the overwhelming evidence that the search was unreasonable. Accordingly, we reverse the district court's dismissal of King's claim and hold that he pleaded sufficient facts to establish a Fourth Amendment claim plausibly entitling him to relief.

b.

King next appeals the dismissal of his Eighth Amendment claim. The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 297 (1991). "[T]o make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.'" Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991)). The first prong is objective and requires that the deprivation be "sufficiently

18

serious"; the second requires us to determine whether subjectively "the officials act[ed] with a sufficiently culpable state of mind." Wilson, 501 U.S. at 298; see Strickler, 989 F.3d at 1379.

We hold that King's complaint plausibly satisfies both prongs of an Eighth Amendment claim and reverse the district court. Regarding the first prong, King alleged physical injury and mental anguish, which he "never experienced until after [he] was FORCED into having [his] implants removed . . . or remaining in Segregation INDEFINATELY [sic]." J.A. 27. These include tingling and numbness in his penis; pain in the area where the marbles were removed; an "uncomfortable, stretching feeling where the cut was made;" pain in his penis when it rains, snows, or gets cold; and "stabbing pain [that] shoots into [his] stomach" if he bumps into something or his penis is touched where the scar is. Id. at 15, 27. King also gets "very depressed every time [he] shower[s] or urinate[s]" because he sees the scarring and is reminded of the marbles that his deceased fiancée bought for him. Id. at 15. He worries about "the possibilities that [his] penis will still be numb when [he] . . . is with another woman" and about how he will explain what happened if someone is "sickened by the scarring." Id. at 16. He is now unable to urinate when any of his five roommates are in the cell with him, a problem he did not previously

19

experience.  Id. at 15.  He is also frightened every time he sees any of the defendants.  Id.  King claims that he is "constantly ridiculed by staff":  they call him "Marble Man" and ask where his marbles are.  Id.  Guards also "make Homosexual remarks that entail [his] marbles when they see [him]."  Id.  He now has "[g]ay inmates approaching [him] because the staff that was involved in forcing [him] to have the surgery, have continually gossiped" about him.  Id. at 16.  These inmates ask him questions that are "very uncomfortable" and put him in a "compromising situation, where it is a strong possibility that a physical confrontation" will occur.  Id. at 17.  These facts are sufficient to support a finding of serious injury.

In dismissing the claim, the district court read too narrowly the extent of King's harm.  The court pointed to our decision in Allgood v. Morris, 724 F.2d 1098 (4th Cir. 1984), for the proposition that segregated confinement is not unconstitutional.  The court also concluded that any harm to King resulted only from the surgery, not from his segregation.

This reliance on Allgood is misplaced.  Indeed, we stated, "[S]egregated confinement is not per se unconstitutional." Allgood, 724 F.2d at 1101 (citing Sweet v. S.C. Dep't of Corr., 529 F.2d 854, 860 (4th Cir. 1975)).  But that very language is fatal to the district court's conclusion.  Segregation, by itself, is not the harm King alleged in his complaint.  Cf.

20

Sweet, 529 F.2d at 861 ("[Certain] inescapable accompaniments of segregated confinement[] will not render segregated confinement unconstitutional absent other illegitimate deprivations." (emphasis added)).

In his complaint, King provides that his Eighth Amendment claim was based on more than the confinement itself: "The Staff at [HCC] Abused their power when they took it upon themselves to use threats of Administrative Segregation for the remainder of my sentence and loss of Parole Eligibility in order to intimidate me into consenting to a surgery that they had no right to have performed." J.A. 16; see id. at 15, 25-27 (describing threats of administrative segregation until discharge of sentence, as well as sentence of punitive segregation, loss of privileges, and loss of good time for violation of policy directive). Put another way, King alleges more than segregation per se as his Eighth Amendment violation; instead, the confinement itself was used as a tool to coerce King into consenting to surgery, which in turn resulted in physical and mental injuries. This harm resulting from the coerced surgery, of which the segregation was a part, is sufficient to satisfy the first prong of an Eighth Amendment violation.

As to the second prong, only the "unnecessary and wanton infliction of pain" implicates the Eighth Amendment. Wilson,

21

501 U.S. at 297 (quoting Estelle, 429 U.S. at 104) (emphasis omitted). The requisite state of mind is thus "one of deliberate indifference to inmate health or safety." Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (citation and internal quotation marks omitted). While "deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994).

"Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" Rhodes v. Chapman, 452 U.S. 337, 346 (1981) (quoting Gregg v. Georgia, 428 U.S 153, 183 (1976)). A prisoner states a claim under the Eighth Amendment when he plausibly alleges that the conduct in question "was motivated by a desire to harass or humiliate rather than by a legitimate justification, such as the need for order and security." King, 781 F.3d at 897 (citing cases); see also Hope v. Pelzer, 536 U.S. 730, 738 (2002) (discussing "taunting" and "humiliation" as circumstances that contributed to finding that unnecessarily handcuffing prisoner to a hitching post "violated the 'basic concept underlying the Eighth Amendment[, which] is nothing less than the dignity of man'" (quoting Trop v. Dulles, 356 U.S. 86, 100 (1958)

22

(alterations in original)); Hudson, 468 U.S. at 530 (underscoring that the Eighth Amendment protects against "calculated harassment unrelated to prison needs").

In King, the Seventh Circuit reversed a district court's dismissal of an inmate's claim that being forced to wear a transparent jumpsuit during his transfer violated the Eighth Amendment. 781 F.3d at 896. The court pointed to the plaintiff's allegations that he was "degraded and humiliated by being transported in a see-through jumpsuit that left him exposed . . . ." Id. at 898. The plaintiff's assertion that "there was no legitimate reason for this policy" was supported by his allegation, among others, that other inmates were not required to wear similar garments. Id. The court cautioned, "Even where prison authorities are able to identify a valid correctional justification for the search, it may still violate the Eighth Amendment if conducted in a harassing manner intended to humiliate and cause psychological pain." Id. at 897 (citation and internal quotation marks omitted).

Here, King alleged that there was "absolutely NO security interest" in removing his implants, J.A. 16; see also id. at 18 ("There was absolutely NO penological interest in forcing the Petitioner to consent to the surgery."), and supports this contention with factual allegations. The removal was not medically necessary: the nurse who first examined him confirmed

23

that the marbles were not recently implanted and there was no sign of infection, and the doctor he saw confirmed this. Id. at 25-26. Further, King alleges that other prisoners have "implanted foreign objects into their penises," but unlike King, they have been permitted to keep them. Id. at 27. King notes that some of these inmates have "even had it done while incarcerated." Id. at 17. Like those presented in King, "[t]hese facts tend to suggest that there was no security reason" for requiring either surgery or indefinite segregation. See 781 F.3d at 898.

Moreover, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842; Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015). Here, as King argues, "[i]nvasive surgery on a highly-sensitive body part has obvious risks," of which the defendants must have been aware. King Br. 30. We agree that these risks were "compounded" by the fact that the marbles were not recently implanted and their removal not medically necessary. Id. King's consent to the surgery does not change this. A prisoner does not absolve correctional officers of risk simply by "not accepting [their] offer to stay in segregation." Thomas v. Younce, 604 F. App'x 325, 326 (4th Cir. 2015) (unpublished). Here, King "did not voluntarily place himself at risk [posed by surgery]; rather, he refused [the]

24

objectionable offer to place him in segregation . . . in lieu of [surgery], where he faced substantial risk of serious injury." Id. We thus reverse the district court's dismissal of King's Eighth Amendment claim.

c.

King also appeals the dismissal of his Fourteenth Amendment Equal Protection claim. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (internal quotation marks and alteration omitted). "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). We then consider "whether the disparity in treatment can be justified under the requisite level of scrutiny." Id. "[T]he Supreme Court has recognized the validity of 'class of one' Equal Protection claims, 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Willis v. Town Of Marshall, N.C., 426 F.3d 251, 263 (4th Cir. 2005)

25

(quoting Olech, 528 U.S. at 564); see also Sansotta v. Town of Nags Head, 724 F.3d 533, 542-44 & n.13 (4th Cir. 2013). We hold that King's allegations are sufficient to state a class-of-one equal protection claim.[1]

With regard to the first prong, we find that King's complaint alleged facts that he was treated differently from other similarly situated inmates. King alleged that there were at least two other inmates with implants in their penises. These inmates were known to prison officials and were similarly "caught, charged and convicted," but neither was subjected to extended segregation or surgery. J.A. at 17. King further alleges that the defendants "single[d him] out" from these other inmates. Id. at 27. Taken together, we find these allegations sufficient to state an intentional disparity in treatment from other similarly situated inmates.

We thus turn to the second prong of King's equal protection claim. In general, unless a suspect class is involved, disparate treatment "is presumed to be valid and will be sustained 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" Veney v. Wyche, 293 F.3d 726, 731 (4th Cir. 2002)

---

[1] We note King's argument that he was discriminated against because of homosexual animus on the part of prison officials. Because we find that King has stated a class-of-one claim, we do not find it necessary to resolve this alternative theory now.

(quoting Heller v. Doe, 509 U.S. 312, 319-20 (1993)); see also Olech, 528 U.S. at 564 (applying rational basis review to class-of-one claims).  When equal protection challenges arise in the prison context, however, "courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner."  Veney, 293 F.3d at 732.  That is, even when a "regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Turner, 482 U.S. at 89; Morrison, 239 F.3d at 655.  To evaluate whether an action is reasonable, we apply the factors set forth in Turner:  (1) whether there is a "valid, rational connection between the policy and the penological interest"; (2) whether there is an "alternative means of exercising the right" available to inmates; (3) what "impact accommodation of the asserted right will have on" the prison, including guards, other inmates, and prison resources; and (4) "the absence of ready alternatives that fully accommodate the prisoner's rights at de minimis cost to valid penological interests."  Morrison, 239 F.3d at 655 (citing Turner, 482 U.S. at 89).

We have held that "[p]romoting the inmates' safety and health is a legitimate concern."  Jehovah v. Clarke, 798 F.3d 169, 178 (4th Cir. 2015) (citing McRae v. Johnson, 261 F. App'x

27

554, 558 (4th Cir. 2008) (unpublished)). Nonetheless, as discussed above, we are not persuaded by the defendants' arguments that King's marbles posed a security threat. Additionally, the defendants' argument that permitting King to keep the marbles could lead other inmates to implant objects into their bodies is also unconvincing. Unlike with King, in the defendants' scenario, other inmates would be implanting these objects while incarcerated, which behavior the prison has a policy to address.

Moreover, we do not find that the other Turner factors—particularly the third and fourth factors—support the conclusion that that surgery was reasonable. We acknowledge that the fourth factor, the absence of ready alternatives, "is not a 'least restrictive alternative' test." Turner, 482 U.S. at 90. Nevertheless, when pressed at oral argument, the defendants were unable to explain why their process for dealing with an inmate who enters prison with tattoos or even a steel rod in his arm—where the condition is documented at booking and the inmate is subsequently "monitored"—cannot be applied to King's situation.[2] King also suggested other alternatives to surgery, including leaving him alone, as defendants had allegedly done with other

---

[2] Here, instead, when King was originally processed and informed the officer of the marbles and tattoo, he was rebuffed by the officer, who told him, "This isn't a pornographic camera, put [your] clothes back on." J.A. 25.

inmates, or requiring him to cover the implants with clothing as to not reveal their presence.

Here, the implants posed no medical risk to King, were not recently implanted, and were not accessible nonsurgically. The defendants do not appear to have made any attempt to confirm whether the marbles posed a security risk and could not explain why they could not monitor King's marbles in the same way as other types of preincarceration body modifications. On this record, we conclude that surgery was an unreasonable "exaggerated response" to defendants' concerns. See id. Therefore, we reverse the district court's dismissal of King's Equal Protection claim.

d.

On appeal, King argues that he alleged sufficient facts to state a claim under the Due Process Clause of the Fourteenth Amendment. The district court did not originally consider any substantive due process claim, and the defendants argue that King raises this claim for the first time on appeal. Nevertheless, King was "not required to use any precise or magical words in [his] pleading." Stevenson v. City of Seat Pleasant, Md., 743 F.3d 411, 418 (4th Cir. 2014); see also Labram v. Havel, 43 F.3d 918, 920 (4th Cir. 1995) ("Legal labels characterizing a claim cannot, standing alone, determine whether it fails to meet [the standard for notice pleading under Federal

29

Rule of Civil Procedure 8(a)(2)]."). Simply because King did not specifically label a claim under a due process heading does not mean that he did not raise one.

"[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 278 (1990). This liberty interest survives conviction and incarceration. Washington v. Harper, 494 U.S. 210, 221-22, (1990) (recognizing an individual's "significant liberty interest in avoiding the unwanted administration" of a specific form of medical treatment); Hogan v. Carter, 85 F.3d 1113, 1116 (4th Cir. 1996) (en banc) (citing Harper, 494 U.S. 221-22). In this context, prison officials may override this right when treatment is "reasonably related to legitimate penological interests." Harper, 494 U.S. at 223 (citing Turner, 482 U.S. at 89). "This is true even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review." Id. (citation omitted). As the district court did not consider this potential claim, and given

the facts alleged in King's complaint, we remand for consideration of this claim.[3]

e.

King appeals the dismissal without prejudice[4] of Scott for failure to effect service. "[T]o preserve for appeal an issue

---

[3] The defendants argued that they are entitled to qualified immunity, as any constitutional violations were not clearly established. The district court did not consider this argument, presumably because it concluded that King failed to allege a violation. As we may affirm a dismissal on any grounds supported by the record, Pitt Cty. v. Hotels.com, L.P., 553 F.3d 308, 311 (4th Cir. 2009), we briefly consider the argument here.

Even where a plaintiff suffers a constitutional violation, an officer is only liable if "the right was clearly established at the time the violation occurred such that a reasonable person would have known that his conduct was unconstitutional." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015). "We do not require that a prior case be identical to the case at bar for fair notice to be provided." West v. Murphy, 771 F.3d 209, 216 (4th Cir. 2014) (citing Hope, 536 U.S. at 741). Instead, a law is clearly established "so long as 'existing precedent [has] placed the statutory or constitutional question beyond debate.'" Id. (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011)).

We decline to affirm the dismissal on qualified-immunity grounds at this stage: we cannot conclude that a right to be free from an egregiously sexually invasive, unjustified, compelled surgery was not clearly established under the Fourth, Eighth, and Fourteenth Amendments. See Cruzan, 497 U.S. at 278 ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."); Wolfish, 441 U.S. at 560 (establishing that inmate searches "must be conducted in a reasonable manner" (citing Schmerber, 384 U.S. at 771-72)); Morrison, 239 F.3d at 655 ("[R]egulation that impinges on inmates' constitutional rights . . . is [only] valid if it is reasonably related to legitimate penological interests."); Lopez v. Robinson, 914 F.2d 486, 490 (4th Cir. 1990) ("Prison conditions are unconstitutional if they constitute an 'unnecessary and wanton' infliction of pain and are 'totally without penological justification.'" (quoting Rhodes, 452 U.S. at 346)).

31

in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." Makdessi, 789 F.3d at 131 (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)) (alteration in original). "Where an appellant has failed to preserve an issue, it is deemed waived." Id. Here, despite objecting on multiple other grounds to the report and recommendation, King did not object to the magistrate judge's recommendation that Scott be dismissed without prejudice. Accordingly, King waived his right to appeal Scott's dismissal, and we affirm the district court.

f.

Finally, King appeals the dismissal of his claims against Plumley, Goodin, and Rubenstein with prejudice. Alternatively, King argues that he should have been permitted leave to amend his complaint as to these defendants.

A state official can be in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more

---

[4] The district court's conclusion appears to have accidentally dismissed the complaint in its entirety with prejudice, and the judgment entered by the clerk indicates that King's complaint was dismissed with prejudice. Nevertheless, the district court's order dismissed Scott without prejudice, and both parties understand that the dismissal was without prejudice. J.A. 163; King's Reply Br. 29; Defs.' Br. 47.

32

limited way, his supervisory capacity. For personal liability, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucky v. Graham, 473 U.S. 159, 166 (1985). In an official-capacity suit, however, "[m]ore is required": the suit is "treated as a suit against the entity," which must then be a "'moving force' behind the deprivation," id. (third quotation quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)); thus, the entity's "'policy or custom' must have played a part in the violation of federal law," id. (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)). Meanwhile, a supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury"; (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

As to Plumley, we find that King properly stated a claim. Regarding actions in his personal capacity, Plumley overturned the Ad.-Seg. Committee's recommendation that King return to the general population. King claims that Plumley so decided "because I had not had the marbles surgically removed." J.A. 31;

33

see also id. ("I wrote an appeal to Warden Plumley seeking release from ad-seg.  Shortly thereafter I was told by the Unit Manager . . . that if I did not have the marbles removed I would be sent to the Quality of Life Program at Mount Olive Correctional Complex . . . .").  The defendants point to documentation King produced in his opposition to their motion to dismiss, which shows that Plumley rejected the committee's recommendation to keep King in punitive segregation, instead sending him to administrative segregation.  Nevertheless, Plumley appears to have participated to some degree in King's segregation.  King also claims that the "Administration here at Huttonsville has chosen to single me out for some unknown reason."  Id. at 27.  The warden, more so than anyone, should be considered the administration.

The district court concluded that these facts "only show[ed] that Plumley played a part in King's housing in administrative segregation that allegedly led to the surgery." Id. at 165.  As the district court found that segregated confinement was not a per se Eighth Amendment violation, it held that King failed to state a claim.  As held above, however, it was not the segregation standing alone that may have constituted the Eighth Amendment violation.

That "King [did] not contend that Plumley [was] liable in his official or supervisory capacity," id. at 166, is belied by

34

the caption itself:  King brought suit against all defendants in their personal and official capacities.  Moreover, the few allegations contained in the complaint itself, construed liberally, attempt to make a connection between Plumley's actions and subsequent actions of his subordinate staff.  E.g., id. at 26 ("The Warden overturned their recommendation and Sherri Davis (Unit Manager-Seg. Unit E-2) had me escorted to her office [where she] had me sign a paper that she would NOT permit me to read.  She said it was consent papers to go to Ruby Memorial Medical Center to have a doctor examine the implants, and if necessary, have them removed."); id. at 31 ("I wrote an appeal to Warden Plumley seeking release from ad-seg.  Shortly thereafter I was told by the Unit Manager of E-Unit Lester Thomspon, that if I did not have the marbles removed I would be sent to the Quality of Life Program at Mount Olive Correctional Complex . . . .").  In his objection to the magistrate judge's recommendation, King also provided,

> Plumley is the Warden of HCC.  He has the final say in Administrative Segregation Hearings.  When the Board released the Plaintiff from Ad. Seg., he overturned their decision, and ordered the Plaintiff to remain on Ad. Seg. Status until he agreed to surgery.  Therefore he directly participated in the violation of Plaintiff's . . . Rights, and should not be relieved of responsibility for his actions.

Id. at 148.  Accordingly, we find that King stated a claim against Plumley and reverse his dismissal with prejudice.

35

King's allegations as to Rubenstein and Goodin are admittedly significantly less robust, and the district court found that King made no mention of either outside of the caption of his complaint. King did make slightly more specific allegations as to these defendants in his objections to the magistrate judge's report and recommendation. Even a pro se plaintiff, however, must allege sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 555, 570. We find the facts alleged to fall short of this standard.

Nevertheless, we find that the dismissal against these two defendants should have been without prejudice. Here, King did not move to amend his complaint, and we do not "expect[] the district courts to assume the role of advocate for the pro se plaintiff." Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978). But the district court neither gave King the opportunity to amend nor did it engage in any discussion as to why amendment would be futile. In such a situation, the dismissal should generally be without prejudice. See Arnett v. Webster, 658 F.3d 742, 756 (7th Cir. 2011); Coleman v. Peyton, 340 F.2d 603, 604 (4th Cir. 1965) (per curiam) (holding that, if a pro se complaint contains a potentially cognizable claim, the plaintiff should be given an opportunity to particularize his

36

allegations).  Accordingly, we affirm the dismissal as to Rubenstein and Goodin but modify it to reflect that it is without prejudice.

IV.

Based on the foregoing, we conclude that King properly stated his Fourth, Eighth, and Fourteenth Amendment Equal Protection and Due Process claims.  We also hold that King stated a claim against Marvin Plumley.  We reverse the district court's decision on those bases, vacate the dismissal, and remand the case for further proceedings.  We affirm the dismissal as to Stacy Scott.  We also affirm the dismissal as to Cliff Goodin and Jim Rubenstein but modify it to be without prejudice.

AFFIRMED IN PART, REVERSED, VACATED, AND REMANDED IN PART
FOR PROCEEDINGS CONSISTENT WITH THIS OPINION

37